Yvette M. MAURIN, as Personal Representative of the Estate of Shay Leigh Maurin, deceased, Plaintiff-Respondent-Cross-Appellant,†

Yvette M. MAURIN, Individually and as Personal Representative of the Estate of Shay Leigh Maurin, and Joseph Maurin, Plaintiff-Respondent,

QUAD/GRAPHICS, INC., Plaintiff,

v.

Gordon HALL, M.D., Physicians Insurance Company of Wisconsin, Inc., and Patients Compensation Fund, Defendants-Appellants-Cross-Respondents.

Supreme Court

*No. 00–0072. Oral argument April 7, 2004.—Decided July 2, 2004.*

2004 WI 100

(Also reported in 682 N.W.2d 866.)

† Motion for Reconsideration denied 10-29-04 (see 2004 WI 129).

Abrahamson, C.J. and Crooks, J., concur.
Wilcox, J., concurs.
Prosser and Sykes, J.J., join.
Bradley, J., concurs.

For the defendants-appellants-cross respondents there were briefs by *Michael B. Van Sicklen, Roberta F.*

*Howell* and *Foley & Lardner,* Madison; *Mark E. Larson* and *Gutglass, Erickson, Bonville, Seibel & Falkner, S.C.,* Milwaukee; *Steven P. Sager* and *Sager, Colwin, Samuelson & Associates,* Fond du Lac; *John S. Skilton* and *Heller Ehrman White & McAuliffe, LLP,* Madison, and oral argument by *Roberta F. Howell, Mark E. Larson* and *Steven P. Sager.*

For the plaintiff-respondent-cross appellant there were briefs by *J. Michael End, Jerome A. Hierseman, Lora A. Kaelber* and *Gray & End, L.L.P.,* Milwaukee, and oral argument by *J. Michael End* and *Jerome A. Hierseman.*

An amicus curiae brief was filed by *Timothy J. Muldowney, Jennifer L. Peterson* and *LaFollette Godfrey & Kahn,* Madison; *Lana J. Leitch,* Madison; and *Mark L. Adams* and *Melanie Cohen,* Madison, on behalf of the Wisconsin Medical Society, The American Medical Association, and The Wisconsin Hospital Association, Inc.

An amicus curiae brief was filed by *William C. Gleisner, III* and *Law Offices of William Gleisner,* Milwaukee; *Edward E. Robinson* and *Cannon & Dunphy, S.C.,* Brookfield; *David M. Skoglind* and *Aiken & Scoptur, S.C.,* Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. This case comes before us on certification from the court of appeals pursuant to Wis. Stat. § 809.61 (2001–02).[1] Yvette Maurin, individually and in her capacity as personal representative of her daughter's estate, and Joseph Maurin, in his individual capacity, brought this lawsuit to re-

---

[1] All references to the Wisconsin Statutes are to the 1995–96 edition unless otherwise indicated.

cover for medical malpractice and wrongful death of their five-year-old daughter, Shay Maurin.

¶ 2. The issues certified for our review relate to damage awards for medical malpractice that results in death. We restate the two issues certified by the court of appeals and pose a third issue presented by the parties:

¶ 3. First, may the plaintiffs in a medical malpractice action, where there is a death caused by medical negligence, recover the limit on noneconomic damages for both medical negligence and wrongful death?

¶ 4. Second, is the limit on noneconomic damages in a medical malpractice wrongful death case constitutional?

¶ 5. Third, did the circuit court erroneously exercise its discretion in ordering a remittitur of the verdict in favor of the estate for pre-death pain and suffering, from $550,000 to $100,000.

¶ 6. We conclude that there is a single cap on noneconomic damages recoverable from health care providers for medical malpractice when a patient dies. The cap is the dollar amount listed for the deceased patient in Wis. Stat. § 895.04(4). Claimants eligible to make a wrongful death claim under Wis. Stat. § 655.007 are entitled to make separate claims for the amount listed in Wis. Stat. § 895.04(4) for a death that occurred during the period from May 25, 1995, through April 27, 1998, because of this court's decisions in *Rineck v. Johnson,* 155 Wis. 2d 659, 456 N.W.2d 336 (1990), *rev'd on other grounds, Chang v. State Farm Mut. Auto Ins. Co.,* 182 Wis. 2d 549, 514 N.W.2d 399 (1994), and *Jelinek v. St. Paul Fire & Cas. Ins. Co.,* 182 Wis. 2d 1, 512 N.W.2d 764 (1994).

¶ 7. We also conclude that the limit on noneconomic damages in a medical malpractice wrongful death case is constitutional.

36

¶ 8. Our answers to the first two questions make it unnecessary to address the close question of remittitur in this case. Accordingly, the decision of the circuit court is reversed and the cause remanded for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶ 9. This is a tragic case. Shay Leigh Maurin died on March 8, 1996, of acute diabetic ketoacidosis. The five-year-old daughter of Yvette and Joseph Maurin had appeared to be a healthy child, free of serious illness, until the week before her death. Her parents were unaware that their daughter suffered from diabetes mellitus. If diabetes mellitus is untreated, it can lead to diabetic ketoacidosis and death.

¶ 10. During the first few days of March 1996, Shay had not been feeling well. She was lethargic, drinking fluids all day and eating poorly. Yvette Maurin took her daughter to the General Clinic of West Bend on March 5, 1996. Physician Assistant Randy Purcell diagnosed Shay with an ear infection and prescribed antibiotics. Purcell also advised that Shay should have a fingerstick blood test—used to check for diabetes—if her symptoms did not improve.

¶ 11. Shay's condition worsened rapidly over the next 24 hours. She was unable to eat, she vomited and dry-heaved, and the fruity odor of her breath led her mother to fear she might have diabetes. The mother brought Shay to Hartford Memorial Hospital late in the evening of March 6. By this point, Shay's diabetes had progressed to acute diabetic ketoacidosis. Dr. Gordon Hall attended to Shay, but failed to make the diagnosis of diabetes mellitus or acute diabetic ketoacidosis.

¶ 12. The next morning, on March 7, Shay returned to Hartford Memorial Hospital in serious pain.

Dr. David Madenberg diagnosed the acute diabetic ketoacidosis and attempted treatment before transferring Shay to Children's Hospital of Wisconsin. Shay lost consciousness during the ambulance ride to the new hospital and died the next day.

¶ 13. In 1999 a Washington County jury found that Dr. Hall was negligent in his care of Shay Maurin and that his negligence caused her death. The jury awarded Shay's estate $550,000 for her pre-death pain and suffering and $2,500,000 to her parents as wrongful death damages for their loss of society and companionship.

¶ 14. In post-verdict motions, the parents sought and obtained from the Washington County Circuit Court, Lawrence F. Waddick, Judge, a ruling that the Wis. Stat. § 895.04(4) wrongful death cap was unconstitutional because it deprived litigants of the basic right to a jury trial, violated the due process and equal protection clauses of the constitution, and usurped the power of the judiciary. The parents also sought but failed to obtain a ruling that an increased wrongful death cap could apply retroactively to deaths that occurred before the effective date of the statutory increase. Dr. Hall sought and obtained remittitur with respect to the estate's verdict for pain and suffering, reducing the damages from $550,000 to $100,000.

¶ 15. Dr. Hall appealed the circuit court's decision holding the wrongful death cap unconstitutional and also raised on appeal the issue of whether the estate and the parents were each entitled to noneconomic damages up to the respective limits for medical malpractice and wrongful death.

¶ 16. The court of appeals held the case pending decisions in three relevant cases: *Neiman v. Am. Nat'l Prop. & Cas. Co.,* 2000 WI 83, 236 Wis. 2d 411, 613

N.W.2d 160 (holding unconstitutional retroactive application of an increased cap on noneconomic damages in wrongful death actions to claims that accrued before the effective date of the new cap); *Guzman v. St. Francis Hosp., Inc.,* 2001 WI App 21, 240 Wis. 2d 559, 623 N.W.2d 776 (holding constitutional a cap on noneconomic damages in medical malpractice actions); and *Schultz v. Natwick,* 2002 WI 125, 257 Wis. 2d 19, 653 N.W.2d 266 (applying *Neiman* to all cases involving the retroactive increase of the cap on noneconomic damages in wrongful death cases).

¶ 17. After these decisions, the parents agreed that the issue of retroactive application of the increased wrongful death cap had been determined against them, and that issue is no longer in the case.

## ANALYSIS

A. Limitation on Noneconomic Damages From Medical Malpractice Resulting in Wrongful Death

¶ 18. The first issue to be determined is what limit or limits apply to noneconomic damages in medical malpractice wrongful death. There are three possibilities:

> 1. Dr. Hall contends that the parents' recovery for loss of society and companionship is limited to a total of $150,000 and that the entire award of noneconomic damages (including the parents' wrongful death award and any conscious pain and suffering award to the estate) cannot exceed the limit in Wis. Stat. § 893.55(4)(d), which, adjusted for inflation, is $381,428.

> 2. The parents contend that the estate may recover noneconomic damages for Shay's pain and suffering

before death up to the limit set for medical malpractice under Wis. Stat. § 893.55(4)(d) and the parents may recover for loss of society and companionship up to the limit set for wrongful death under Wis. Stat. § 893.55(4)(f), which references Wis. Stat. § 895.04(4). Absent the issue of remittitur, the effect of this theory would produce damages of $381,428 plus $150,000, for a total of $531,428.

3. A third interpretation is that, in a medical malpractice case, there is a single cap on noneconomic damages. The amount of the cap is determined by whether the patient survives the malpractice or whether the patient dies. When the patient survives the medical malpractice, the cap is contained in Wis. Stat. § 893.55(4)(d). When the patient dies, the cap is contained in Wis. Stat. § 895.04(4). In cases where medical malpractice leads to death, the wrongful death cap applies in lieu of—not in addition to—the medical malpractice cap.

¶ 19. We conclude that the third interpretation constitutes the correct reading of the statutes. However, our decisions in *Rineck,* 155 Wis. 2d 659, and *Jelinek,* 182 Wis. 2d 1, cause us to add separate awards for the two parents to equal $300,000. As will be explained, this is a temporary phenomenon for claims arising between May 25, 1995, and April 27, 1998.

¶ 20. As this is a case of statutory interpretation, our analysis should begin with the plain language of the statutory text. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶¶ 44–45, 271 Wis. 2d 633, 681 N.W.2d 110; *see also Czapinski v. St. Francis Hosp., Inc.,* 2000 WI 80, ¶ 17, 236 Wis. 2d 316, 613 N.W.2d 120. The language of Wis. Stat. § 893.55(4) is to be read in context, taking into account the section at issue and the

entire statutory scheme. *Kalal,* 271 Wis. 2d 633, ¶ 46. The scope and purpose of the statutes are relevant so long as the scope and purpose are ascertainable from statutory language. *Id.,* ¶ 48.

¶ 21. Based upon our review of the relevant text, the applicable statutes should be interpreted as follows.

¶ 22. There is a single cap for noneconomic damages in medical malpractice cases as noted in Wis. Stat. § 893.55(4)(b) which provides:

> The *total* noneconomic damages recoverable for bodily injury *or death,* including any action or proceeding based on contribution or indemnification, may not exceed the limit under par. (d) *for each occurrence* on or after May 25, 1995, from all health care providers and all employes of health care providers acting within the scope of their employment and providing health care services who are found negligent and from the patients compensation fund. (Emphasis added).

¶ 23. Several words in this statute are of paramount importance. The words "total" and "for each occurrence" reveal that the legislature intended a single recovery for each incident or "occurrence" involving malpractice. The words "or death" show that the legislature intended to provide a single recovery even if the medical malpractice resulted in a wrongful death.[2]

¶ 24. Other paragraphs in Wis. Stat. § 893.55(4) address various scenarios resulting from medical mal-

---

[2] The concurrence contends that "The majority goes astray when it equates the word 'death' with a cause of action for wrongful death." Concurrence, ¶ 137. However, the concurrence simply disregards the language in Wis. Stat. § 655.007 that any "parent . . . having a derivative claim for . . . death on account of malpractice is subject to this chapter." *See* ¶ 30, *infra,* for the linkage between Wis. Stat. ch. 655 and Wis. Stat. § 893.55(4)(d).

practice. When a patient survives medical malpractice, the cap on noneconomic damages is contained in Wis. Stat. § 893.55(4)(d), which provides:

> *The limit on total noneconomic damages for each occurrence* under par. (b) on or after May 25, 1995, shall be $350,000 and shall be adjusted by the director of state courts to reflect changes in the consumer price index . . . . (Emphasis added).

¶ 25. When a patient dies as a result of medical malpractice, the cap on noneconomic damages is transferred to Wis. Stat. § 895.04(4), which provides:

> Judgment for damages for pecuniary injury from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional damages not to exceed *$150,000* for loss of society and companionship may be awarded to the spouse, children or parents of the deceased. (Emphasis added).

¶ 26. The bridge taking a medical malpractice claim in a death case from Wis. Stat. § 893.55(4)(d) to Wis. Stat. § 895.04(4) is Wis. Stat. § 893.55(4)(f), which provides:

> Notwithstanding the limits on noneconomic damages under this subsection, *damages recoverable against health care providers* and an employe of a health care provider, acting within the scope of his or her employment and providing health care services, *for wrongful death are subject to the limit under s. 895.04(4).* (Emphasis added).

¶ 27. It should be noted that economic damages in a medical malpractice wrongful death case are *not*

---

In this opinion, all references to the "concurrence" are intended to refer to the concurrence of Chief Justice Shirley S. Abrahamson and Justice N. Patrick Crooks.

capped. "Economic damages" are alluded to in Wis. Stat. § 893.55(4)(e), § 893.55(5) and (6), and § 895.04. Economic damages *include* "loss of earnings or earning capacity" and "other economic injuries and damages." Wis. Stat. § 893.55(5). Consequently, beyond issues of proof, damage disputes in medical malpractice cases tend to involve noneconomic damages, which are defined in Wis. Stat. § 893.55(4)(a):

> In this subsection, "noneconomic damages" means moneys intended to compensate for pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; loss of consortium, society and companionship; or loss of love and affection.

¶ 28. "Loss of society and companionship" is included in the definition of "noneconomic damages." Loss of society and companionship is the basis for noneconomic damages in a wrongful death claim. Wis. Stat. § 895.04(4). As a result, the damages for loss of society and companionship in § 895.04(4) are included within "total noneconomic damages recoverable" for death in Wis. Stat. § 893.55(4)(b).[3]

¶ 29. The parents in this case seek recovery for the death of a minor child resulting from medical malpractice. Every patient, patient's representative, and health care provider "shall be conclusively pre-

---

[3] The concurrence acknowledges that the definition of "loss of society and companionship" in Wis. Stat. § 893.55(4)(a) is broad enough to encompass "loss of society and companionship" under the wrongful death statute. It contends, however, that Wis. Stat. § 893.55(4)(f) exempts wrongful death damages from the cap under § 893.55(4)(d).

43

sumed to have accepted to be bound by" Wis. Stat. ch. 655. Wis. Stat. § 655.006(1). Wisconsin Stat. § 655.007 provides that "any patient or the patient's representative having a claim or *any . . . , parent . . . of the patient having a derivative claim for . . . death on account of malpractice* is subject to" Chapter 655 of the Wisconsin Statutes. (Emphasis added). A parent's claim for the loss of society and companionship of a minor child is a derivative claim. *Korth v. Am. Family Ins. Co.,* 115 Wis. 2d 326, 331, 340 N.W.2d 494 (1983); *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 405, 331 N.W.2d 585 (1983); *see also White v. Lunder,* 66 Wis. 2d 563, 574, 225 N.W.2d 442 (1975).

¶ 30. Wisconsin Stat. § 655.017, entitled "Limitation on noneconomic damages," links Chapter 655 to Wis. Stat. § 893.55(4)(d). It reads:

> The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter for acts or omissions of a health care provider if the act or omission occurs on or after May 25, 1995, and for acts or omissions of an employee of a health care provider, acting within the scope of his or her employment and providing health care services, for acts or omissions occurring on or after May 25, 1995, is subject to the limits under s. 893.55(4)(d) and (f).

¶ 31. The conclusion is inescapable that derivative wrongful death claims resulting from medical malpractice are covered by the limitations outlined in Wis. Stat. § 893.55(4).

¶ 32. This brings us to the question of how noneconomic damages in wrongful death cases are limited.

¶ 33. If Wis. Stat. § 893.55(4)(d) stood alone because there were no subsection (4)(f), then subsection (4)(d) would cap total noneconomic damages, including

damages for loss of society and companionship under § 895.04(4). This was the unanimous decision of this court in *Rineck,* 155 Wis. 2d at 665–69. If there were no caps at all in Wis. Stat. § 893.55(4)(d), then there would be no limits on noneconomic damages in wrongful death. That was the unanimous decision of the court in *Jelinek,* 182 Wis. 2d at 14.

¶ 34. Against this background, why did the legislature create Wis. Stat. § 893.55(4)(f)? The paragraph reads in part:

> (f) Notwithstanding the limits on noneconomic damages under this subsection, damages recoverable against health care providers . . . for wrongful death are subject to the limit under s. 895.04(4).

¶ 35. Wisconsin Stat. § 893.55(4)(f) was created by 1995 Wisconsin Act 10. This act did *not* amend § 895.04, the wrongful death statute. Consequently we can conceive of no purpose for creating § 893.55(4)(f) *if* the legislature intended to retain the single cap in Wis. Stat. § 893.55(4)(d) to cover total noneconomic damages in a wrongful death case involving medical malpractice. The same result would have been achieved without creating the new paragraph. This leads us to reject Dr. Hall's interpretation of the statute.[4]

---

[4] The concurrence notes that the limit in Wis. Stat. § 893.55(4)(d) is less than the present limit in Wis. Stat. § 895.04(4). Thus, if the cap in § 893.55(4)(d) superseded the cap in § 895.04(4), it would not be possible to collect $500,000 in damages for the loss of society and companionship of a minor child until the § 893.55(4)(d) cap, indexed for inflation, caught up to the $500,000 figure. This analysis is correct. However, under our view of the law, the limits in § 895.04(4) are available immediately.

¶ 36. Thus, the case turns on the meaning of the phrase "Notwithstanding the limits on noneconomic damages under this subsection." The court interprets the word "notwithstanding" to mean, in effect: "*In lieu of* the limits on noneconomic damages under this subsection, damages recoverable against a health care provider . . . for wrongful death are subject to the limit under § 895.04(4)." By contrast, the concurrence interprets the word to mean, in effect: "*In addition to* the limits on noneconomic damages under this subsection, damages recoverable against a health care provider . . . for wrongful death are subject to the limit under s. 895.04(4)."

¶ 37. We acknowledge that the meaning of "notwithstanding" by itself is not clear. According to *The American Heritage Dictionary of the English Language* 1238 (3d ed. 1992), "notwithstanding" means "in spite of." Turning to *Black's Law Dictionary,* "notwithstanding" is listed as a preposition: "Despite, in spite of ." *Black's Law Dictionary* 1091 (7th ed. 1999). In *A Dictionary of Modern Legal Usage,* "notwithstanding" is described as "an interesting word. In DRAFTING, it commonly means 'despite,' 'in spite of,' or 'although' and appears in sentences such as this one: 'Notwithstanding the limitations contained in § 3.5, Mondraff will be offered the first option to quote competitive terms and conditions to Nuboil.' " Bryan A. Garner, *A Dictionary of Modern Legal Usage* 600 (2d ed. 1995).

¶ 38. If we substitute "in spite of" for "notwithstanding," the clause would read: "In spite of the *limits* on noneconomic damages under this subsection, damages recoverable against health care providers . . . for wrongful death are subject to the *limit* under § 895.04(4)." (Emphasis added). A natural reading of

46

this language is closer to "in lieu of" than "in addition to." One limit appears to supersede another.

¶ 39. The Legislative Reference Bureau's drafting manual in effect at the time the 1995 legislation was enacted directs drafters to "[a]void overbroad preemption provisions" such as " 'notwithstanding any other law to the contrary.' . . . Instead, find the statutes that conflict with the new provision and refer to them specifically." State of Wisconsin Legislative Reference Bureau, *Wisconsin Bill Drafting Manual* § 9.05(5) (1994–95). Wisconsin Stat. § 893.55(4)(f) refers specifically to "the limits on noneconomic damages under this subsection," suggesting that subsection 4(f) preempts subsection 4(d).

¶ 40. The preemptive use of "notwithstanding" can be seen in Wis. Stat. § 655.23(4)(c)1. and 2. (2001–02);[5] and Wis. Stat. § 895.045(2) (2001–02).[6]

---

[5] Wisconsin Stat. § 655.23(4)(c)1. and 2. (2001–02) provide:

1. Except as provided in subd. 2., self-insurance shall be in amounts of at least $200,000 for each occurrence and $600,000 for all occurrences in any one policy year for occurrences before July 1, 1987, $300,000 for each occurrence and $900,000 for all occurrences in any one policy year for occurrences on or after July 1, 1987, and before July 1, 1988, $400,000 for each occurrence and $1,000,000 for all occurrences in any one policy year for occurrences on or after July 1, 1988, and before July 1, 1997, and $1,000,000 for each occurrence and $3,000,000 for all occurrences in any one policy year for occurrences on or after July 1, 1997.

2. *Notwithstanding* subd. 1., in the discretion of a self-insured health care provider, self-insurance may be in an amount that is less than $1,000,000 but not less than $600,000 for each occurrence on or after July 1, 1997, and before July 1, 1999, and less than $1,000,000 but not less than $800,000 for each occurrence on or after July 1, 1999, and before July 1, 2001. (Emphasis added).

[6] Wisconsin Stat. § 895.045(2) (2001–02) provides:

¶ 41. It would be easy enough to collect cases interpreting the word "notwithstanding." *See, e.g., Liberty Mar. Corp. v. United States,* 928 F.2d 413, 416–17 (D.C. Cir. 1991) (suggesting that a phrase preceded by notwithstanding should overcome any conflicting provision). But the better practice is to follow the advice in *Conoco, Inc. v. Skinner,* 970 F.2d 1206, 1224 (3d Cir. 1992), that "courts must discern the meaning of 'notwithstanding' from the legislative history, purpose, and structure of the entire statute." In this regard, a court must confront the principal declaration in Wis. Stat. § 893.55(4)(f) that "damages recoverable against health care providers . . . for wrongful death are subject to the *limit* under s. 895.04(4)." (Emphasis added). This declaration added nothing to the statute if it did not *reduce* "total noneconomic damages recoverable for . . . death." Moreover, the careful reader cannot fail to observe the similarity between the phrase "are *subject to the limit* under § 895.04(4)" in subsection (4)(f) and the phrase "is *subject to the limits* under s. 893.55(4)(d) and (f)." "Subject to" suggests that damages are dependent upon the limit in the enumerated statutes.

¶ 42. Our interpretation of subsection (4)(f) is consistent with Wis. Stat. § 893.55(4)(b), which provides for "total noneconomic damages recoverable" per occurrence even if the occurrence leads to death. The concurrence's interpretation of subsection (4)(f) makes § 893.55(4)(b) superfluous. There is nothing in the text of the statute that signals a complete shift in policy

(2) Concerted action. *Notwithstanding* sub. (1), if 2 or more parties act in accordance with a common scheme or plan, those parties are jointly and severally liable for all damages resulting from that action, except as provided in s. 895.85 (5). (Emphasis added).

away from a single cap for noneconomic damages to two separate caps that can be stacked one on top of the other.

¶ 43. The single cap interpretation is also consistent with the 1998 amendments to the wrongful death statute. A $500,000 cap on loss of society and companionship for the death of a minor child represents a 333.3% increase in the statutory cap. A $500,000 cap on top of the medical malpractice cap, as the concurrence would have it, would appear to be at odds with the purpose of the statute.

¶ 44. We conclude that noneconomic damages in a medical malpractice wrongful death case are capped by the limitation in Wis. Stat. § 895.04(4). They are capped to limit the liability of health care providers by requiring that any noneconomic damages that would have been subject to the cap in Wis. Stat. § 893.55(4)(d) and awarded to the deceased personally if he or she had lived, are instead subject to the limit in Wis. Stat. § 895.04(4) and shared by survivors who are normally the plaintiffs in a wrongful death action. That limit is now $500,000 for a minor and $350,000 for an adult.

¶ 45. The concurrence makes two major arguments using statutory construction. First, it points to the language of Wis. Stat. § 655.017: "The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter . . . is subject to the *limits* under s. 893.55(4)(d) *and* (f)." According to the concurrence, "The text of § 655.017 does not limit recovery to the lesser of either the § 893.55(4)(d) limit for medical malpractice or the § 893.55(4)(f) limit for wrongful death. Rather, § 655.017 directs us to both §§ 893.55(4)(d) *and* (f) to assess the limits on damages imposed in cases of medical malpractice causing wrongful death." Concurrence, ¶ 181. "Had the legislature

49

intended to limit recovery to either the § 893.55(4)(d) or the § 893.55(4)(f) limit depending on whether the patient died, it would have used different language." *Id.,* ¶ 182. The response to this argument is that § 655.017 does little more than direct the reader to the binding limits in § 893.55(4). The word "and" between (d) and (f) indicates that there are two limits in subsection (4). Both must be considered. The word "and" does not imply that a claimant collects both limits. Clearly, a surviving victim of malpractice who collects under (4)(d) does not also collect for loss of society and companionship under (4)(f). Hence, the word "and" in § 655.017 does not imply a result in this case.

¶ 46. Second, the concurrence stresses the phrase "for wrongful death" in Wis. Stat. § 893.55(4)(f) and asserts that use of that phrase means that "the limits contained in Wis. Stat. § 893.55(4) (the medical malpractice cap) *do not* apply." Concurrence, ¶ 139. "[D]amages recoverable against health care providers *for wrongful death,* that is, for loss of society and companionship, are subject to the limit under § 895.04(4)." *Id.,* ¶ 140. In response, the jury in this case found medical negligence, leading to death. Consequently, this is a wrongful death case, taking the case out from under one cap and placing it under another. If the legislature had wanted to create separate damages for loss of society and companionship under § 895.04(4), it could easily have said so with different language.

¶ 47. In a case such as this, it is appropriate to consult legislative history to confirm our interpretation of the statute. *See Kalal,* 271 Wis. 2d 633, ¶ 51 (citing *Seider v. O'Connell,* 2000 WI 76, ¶¶ 51–52, 236 Wis. 2d 211, 612 N.W.2d 659).

¶ 48. Over the past 30 years, the legislature has demonstrated an abiding interest in controlling the

costs of health care, including the costs related to medical malpractice. The legislature has shown a consistent pattern of funneling and restricting medical malpractice actions to control costs. It has incrementally circumscribed the procedures for filing medical malpractice actions and limited the noneconomic damages available in such actions.

¶ 49. In 1975 the legislature made its first effort to address "Health Care Liability and Patients Compensation" by creating Chapter 37, Laws of 1975. At the beginning of the chapter, the legislature made extensive findings that we have relied upon in past decisions. *Aicher v. Wisconsin Patients Comp. Fund,* 2000 WI 98, ¶ 22, 237 Wis. 2d 99, 613 N.W.2d 849; *Czapinski,* 236 Wis. 2d 316, ¶ 14; *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 508, 261 N.W.2d 434 (1978). These findings are presented as an Appendix to this opinion.

¶ 50. In *Strykowski,* the court summarized the legislative findings and acknowledged that the legislation "was enacted in response to a perceived economic and social crisis." 81 Wis. 2d at 509. Among its many provisions, the 1975 legislation created a Patients Compensation Fund to pay medical malpractice awards above certain limits. *Id.* at 500. The legislation also "established *an exclusive procedure* for the prosecution of malpractice claims against a '[h]ealth care provider.' " *Id.* at 499 (emphasis added). This can be seen in two sections, Wis. Stat. §§ 655.005 and 655.007:

> 655.005 *Remedy.* (1)(a) On and after the effective date of this act [1975], every patient, every patient's representative and every health care provider shall be conclusively presumed to have accepted to be bound by this chapter.
>
> . . . .

655.007 *Patients' claims.* On and after the effective date of this act [1975], any patient or the patient's representative, having a claim for injury or death on account of malpractice is subject to this chapter.

¶ 51. The 1975 legislation created a procedure for addressing medical malpractice, but it did *not* limit the damage awards arising out of medical malpractice. *See Martin v. Richards,* 192 Wis. 2d 156, 531 N.W.2d 70 (1995).

¶ 52. In 1984 the legislature amended Wis. Stat. § 655.007 to read: "On and after July 24, 1975, any patient or patient's representative having a claim *or any spouse, parent or child of the patient having a derivative claim* for injury or death on account of malpractice is subject to this chapter." 1983 Wis. Act 253 (emphasis added to show amendments). Current Wis. Stat. § 655.007 continues to cover *derivative claims* for medical malpractice, including derivative claims for death. Even before this 1984 amendment, the *Strykowski* court stated that:

> *Medical malpractice actions are substantially distinct from other tort actions.* The classification is plainly germane to the act's purposes. *The law applies to all victims of health care providers as described therein.* ·The legislature declares that the circumstances surrounding medical malpractice litigation and insurance required the enactment of the legislation.

*Strykowski,* 81 Wis. 2d at 509 (emphasis added).

¶ 53. The 1975 legislation was not successful in controlling health care costs. Consequently, in 1985 the legislature attempted to place a global cap on *all* recovery in a medical malpractice case. It considered 1985 Senate Bill 328, which was the product of the Legislative Council's Special Committee on Medical

Malpractice. Senate Bill 328 attempted to impose a $3,300,000 cap on "total damages recoverable" in a Chapter 655 medical malpractice action. The relevant portion of the Senate Bill provided:

> The total damages recoverable under ch. 655 for bodily injury or death, including any action or proceeding based on contribution or indemnification, may not exceed $3,300,000 for each occurrence from all health care providers and all employes of health care providers acting within the scope of their employment and providing health care services who are found negligent and from the patients compensation fund for any act or omission occurring on or after the effective date of this subsection.

1985 S.B. 328.

¶ 54. The Legislative Council note explaining this proposed section stated: "This [$3,300,000] limitation applies to any person bringing a medical malpractice claim, *whether a patient or a family member of a patient having a derivative claim. The limitation applies to the total amount recoverable by the claimant or claimants . . . .*" (Analysis by the Legislative Council of 1985 S.B. 328) (emphasis added). Once again, a wrongful death claim qualifies as a "derivative claim" by a family member. Hence the phrase "total damages recoverable" indicated that the Senate Bill intended a single cap to apply when medical malpractice resulted in death.

¶ 55. 1985 Senate Bill 328 did not pass, but it is significant in understanding current law because it contained two provisions that were carried over to the legislation that did pass in 1986. *See* 1985 Wis. Act 340.

¶ 56. First, both the 1985 bill and the 1986 legislation contained a section 655.017. The provision in 1985 Senate Bill 328 read in part:

655.017 Limitation on Recovery. The amount of damages recoverable by a claimant under this chapter for acts or omissions of a health care provider . . . is subject to the limitation under s. 893.55(4).

1985 S.B. 328.

¶ 57. The provision in the 1986 legislation read:

655.017 Limitation on Noneconomic Damages. The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter for acts or omissions of a health care provider . . . is subject to the limit under s. 893.55(4).

May 1986 Special Session Assembly Bill 4.

¶ 58. Section 655.017 from the 1986 legislation tied *noneconomic* damages in medical malpractice claims under Chapter 655, including derivative claims, to the limit in Wis. Stat. § 893.55(4).

¶ 59. Second, both the 1985 bill and the 1986 legislation contained a provision creating a section 893.55(4). The provision in 1985 Senate Bill 328 pertaining to "total damages recoverable" is quoted in ¶ 53 above. The equivalent provisions in May 1986 Special Session Assembly Bill 4 read:

893.55(4)(b) The *total noneconomic damages recoverable under ch. 655 for . . . death . . .* may not exceed the limit under par. (d) for each occurrence from all health care providers.

. . . .

893.55(4)(d) *The limit on total noneconomic damages for each occurrence under par. (b) shall be $1,000,000* for actions filed on or after the effective date of this paragraph . . . and shall be adjusted by the director of state courts to reflect changes in the consumer price index.

1986 A.B. 4. (emphasis added).

¶ 60. The 1986 legislation was obviously different from the 1985 bill. The dollar cap was reduced from $3,300,000 to $1,000,000, with the latter amount indexed. But this limit applied to "total noneconomic damages recoverable" instead of "total damages recoverable," leaving economic damages uncapped. The newly created subsection 893.55(4) was also broken into several paragraphs.

¶ 61. Interestingly, the first draft of May 1986 Special Session Assembly Bill 4 did not contain the word "total" to modify "noneconomic damages." Legislative Reference Bureau Drafting File for May 1986 A.B. 4 (LRB 5441/1). However, the drafter added the modifier "total" in the second draft, and the legislature ultimately enacted the bill in that form. Wis. Stat. § 893.55(4)(b). It is logical to assume that when the drafter inserted the word "total" into the bill between drafts, someone believed the word was so important that it had to be made part of the final bill. The word "total" reveals an intention to limit noneconomic damages in malpractice suits to a single cap, either the one in Wis. Stat. § 893.55(4)(d) or, conceivably, the one in Wis. Stat. § 895.04(4) (pertaining to wrongful death).

¶ 62. This was the key issue in *Rineck,* 155 Wis. 2d at 661. In *Rineck,* the court interpreted Wis. Stat. § 893.55 to mean that when medical malpractice resulted in wrongful death, the $1,000,000 statutory limit on noneconomic damages under Wis. Stat. § 893.55(4)(d) *superseded* the cap on noneconomic damages under the wrongful death statute. The court said: "We conclude that in a medical malpractice action involving death, the $1,000,000 limitation on recovery for total noneconomic damages imposed by the specific

statutes applicable to malpractice actions supersedes the $50,000 limitation contained in the wrongful death statutes." *Id.*

¶ 63. The court carefully traced the history of the medical malpractice statutes and decided the issue using statutory construction. Had it decided the issue differently, there would have been a $950,000 gap between a medical malpractice noneconomic damages award under § 893.55(4)(d) and a medical malpractice wrongful death award under § 895.04(4). The court made it very clear that one cap superseded the other: "Significantly, ch. 655, Stats., does not state that damages recoverable in medical malpractice cases are *also* subject to the $50,000 limitation under the general wrongful death provisions of sec. 895.04(4)." *Id.* at 666 (emphasis added). The court chose *one* cap and applied it to the claim, saying that the wrongful death cap was "inapplicable." *Id.* at 668.

¶ 64. On January 1, 1991, the cap on noneconomic damages in Wis. Stat. § 893.55(4) was "sunset," meaning that it no longer limited recovery of noneconomic damages in medical malpractice cases. This court recognized as much in *Jelinek,* saying: "Although the cap on non-economic damages in medical malpractice claims has expired, [ ] two legislative objectives for enacting ch. 655, Stats.—to set tort claims resulting from medical malpractice apart from other tort claims and to treat medical malpractice claims for injury and death in exactly the same manner—remain valid." 182 Wis. 2d at 11. The court also noted that multiple claimants could maintain separate causes of action to recover noneconomic damages when a wrongful death occurs. *Id.* at 13–14. The *Rineck* approach of setting medical malpractice wrongful death cases apart from general wrongful death cases continued to apply. *See*

*also Dziadosz v. Zirneski,* 177 Wis. 2d 59, 63, 501 N.W.2d 828 (Ct. App. 1993) (citing *Rineck*).

¶ 65. Our holdings in *Rineck* and *Jelinek* caused consternation within the medical community.[7] Doctors lamented rising costs for health care in general and malpractice insurance in particular. *See* note 7, *supra,* and accompanying citations. They decried the *Jelinek* holding that available noneconomic damages for wrongful death caused by medical malpractice were far greater than available noneconomic damages for other types of wrongful death. *See id.*

¶ 66. In mid-1994 a Special Committee of the Wisconsin Patients Compensation Fund recommended "that a cap of $250,000 be imposed on noneconomic damages," believing that such an amendment "would address an elemental and necessary change in the tort system for resolving medical malpractice claims." Wisconsin Patients Compensation Fund, Report to the Joint Legislative Audit Committee 3 (1994).

---

[7] The health care community exerted pressure on the legislature to put available noneconomic damages in medical malpractice wrongful death claims back on the same footing as general wrongful death claims. *See, e.g., Testimony relating to medical malpractice reform before the Assembly Committee on Insurance, Securities and Corporate Policy,* (Jan. 19, 1995) (statement by Peter Farrow, Executive Assistant to the Commissioner of Insurance) (noting the unsustainable draining effect of the unlimited caps on the Patients Compensation Fund); Letter from Dr. John Wegenke to Members of the Assembly Insurance, Securities and Corporate Policy Committee 2 (Jan. 19, 1995) (attacking distinction between wrongful death caused by medical malpractice and other forms of wrongful death); Letter from Dr. Richard Roberts, President, State Medical Society, to Members of the Senate Committee on the Judiciary and the Senate Committee on Insurance 1 (Feb. 22, 1995) (supporting medical malpractice reform legislation).

57

¶ 67. In 1995 the legislature acted to restore limits on noneconomic damages in medical malpractice actions. It passed 1995 Wisconsin Act 10, which established a new $350,000 limit for noneconomic damages in medical malpractice cases and simultaneously created Wis. Stat. § 893.55(4)(f).

¶ 68. Subsection (4)(f), of course, is central to our analysis because it addresses noneconomic damage limits when medical malpractice causes death. It provides that "Notwithstanding the limits on noneconomic damages under this subsection, *damages recoverable against health care providers . . . for wrongful death are subject to the limit under s. 895.04(4)."* (Emphasis added).

¶ 69. In effect, Wis. Stat. § 893.55(4)(f) was another step in the legislature's unbroken pattern of narrowing the scope of noneconomic damages flowing from medical malpractice claims in order to control costs. It addressed the medical community's concerns in the wake of *Rineck* and *Jelinek* by placing medical malpractice wrongful death claims on the same footing as other wrongful death claims.[8] It did this by referencing the $150,000 limit in the wrongful death statute. That statute allowed claimants up to $150,000 in non-

---

[8] The archival records of Representative Mark Green, principal author of the 1995 legislation that became Act 10, reveal the legislature's concern over our holding in *Jelinek* that medical malpractice wrongful death actions were not subject to the damage limits in the general wrongful death statute. *See Jelinek v. St. Paul Fire & Cas. Ins. Co.,* 182 Wis. 2d 1, 512 N.W.2d 764 (1994); Undated notes of Representative Mark Green (on file with Wisconsin State Historical Society). Representative Green's archival records refer only to restoring the limits in the wrongful death statute, not creating stackable caps.

economic damages for loss of society and companionship. Significantly, however, § 893.55(4)(f) does not speak to how much plaintiffs may recover. It limits the "damages recoverable *against* health care providers." (Emphasis added).

¶ 70. At the time of the 1995 legislation, there were no limits at all on noneconomic damages for a wrongful death resulting from medical malpractice. The legislature changed the law by incorporating the limit under the existing wrongful death statute.

¶ 71. There are several plausible reasons why the legislature substituted a $150,000 limit for a $350,000 indexed cap in wrongful death cases.

¶ 72. First, the legislature may not have had an answer for why the limit on wrongful death in a medical malpractice case was far greater than the limit on wrongful death in other cases. The absence of any limit on either economic or noneconomic damages for wrongful death in medical malpractice cases increased insurance premiums for health care providers and increased assessments on providers to maintain the solvency of the Patients Compensation Fund. Legislative Audit Bureau, 01–11 "*An Audit of the Patients Compensation Fund*" 15 (June 2001). The fact that the law was treating persons responsible for homicide by intoxicated use of a motor vehicle far more favorably than it was treating brain surgeons, pediatricians, and emergency room doctors may have been viewed as requiring a move toward parity in the noneconomic damage limit for wrongful death.

¶ 73. Second, the private notes of Representative Mark Green, principal author of the 1995 legislation, make repeated references to the $250,000 cap on medical malpractice damages involving physicians working at the University of Wisconsin Hospital in Madison (as

well as other state employees). Representative Green alluded to Wis. Stat. § 893.82 entitled "Claims against state employees; notice of claim; limitation of damages." One purpose of this section is to place a limit on the amounts recoverable in civil actions or civil proceedings against any state employee. Wis. Stat. § 893.82(1)(c). In 1995, the section included the following provisions:

> (5m) With regard to a claim to recover damages for medical malpractice, the time periods under subs. (3) and (4) shall be 180 days after discovery of the injury. . . .

> (6) The amount recoverable by any person or entity for *any damages, injuries or death* in any civil action or civil proceeding against a state . . . employe . . . including any such action or proceeding based on contribution or indemnification, shall not exceed *$250,000*. No punitive damages may be allowed or recoverable in any such action. (Emphasis added).

¶ 74. Legislators may have recognized that while Wis. Stat. § 893.82 did not create a global cap against all health care providers, it did cap both economic and noneconomic damages against a single provider.

■

¶ 75. Third, the legislature was aware of this court's decisions in *Rineck* and *Jelinek*. The legislature is presumed to act with knowledge of the existing case law. *Reiter v. Dyken*, 95 Wis. 2d 461, 471, 290 N.W.2d 510 (1980). In *Rineck*, the court concluded that a minor child has a separate cause of action for loss of society and companionship when medical malpractice causes the death of one parent and the decedent is survived by his or her spouse. 155 Wis. 2d at 661–62. The court reasoned that:

[The minor child's] claim originates under ch. 655 rather than the general wrongful death statutes. Chapter 655 controls all claims "for injury or death on account of medical malpractice." Section 655.007. As stated previously, by singling out medical malpractice claims in such a manner, the legislature intended to set medical malpractice cases involving death apart from other death cases to which the general wrongful death statute applies. Therefore, sec. 895.04(2) does not prevent a minor child from maintaining a cause of action for loss of society and companionship when medical malpractice causes the death of a parent.

*Id.* at 671.

¶ 76. In *Jelinek,* the court stated the pertinent issue as follows: "In a medical malpractice action involving death that is commenced after January 1, 1991, may the minor children of the patient who dies as a result of the malpractice maintain separate causes of action for loss of society and companionship when the patient is survived by a spouse who also brings a claim for loss of society and companionship?" *Id.* at 5. The court answered "yes." The *Jelinek* case featured claims by a surviving spouse and three minor children, each of whom was awarded damages of $50,000 for loss of society and companionship, although the cap at that time in Wis. Stat. § 895.04(4) was only $50,000.

¶ 77. The *Jelinek* case was decided at a time when there was no cap on medical malpractice noneconomic damages. As a result, its application to cases after the 1995 legislation is not completely clear. Nonetheless, the view of professional legislative staff was that "arguably, the $150,000 limit applies to each cause of action individually, not in the aggregate." Staff Memorandum to Rep. Mark Green from Don Dyke, Senior Staff Attorney, Wisconsin Legislative Council 2 (Sept. 5,

1997). This view was supported by the fact that the 1995 legislation did not change the law by amending the wrongful death statute. Thus, a legislator who adopted this view in 1995 would have believed that the cap on loss of society and companionship for two parents whose child died as a result of medical malpractice was $300,000, consisting of two potential $150,000 claims. Transposing the facts in *Jelinek* to a post-1995 Act 10 claim, the limit would have been $600,000 for a parent and three minor children, each with a separate claim.

¶ 78. These rationales put the 1995 legislation on the wrongful death cap in perspective.

¶ 79. In 1997 the legislature acted again to narrow the funnel. Acting on the assumption that our holding in *Jelinek* still applied, the legislature added the words "per occurrence" to the wrongful death damage cap in Wis. Stat. § 895.04(4). *See* 1997 Wis. Act 89.[9] The legislature added the phrase "per occurrence" to make it clear that "in wrongful death medical malpractice actions, the limit is a total limit and does not apply individually to each person who may bring an action for loss of society and companionship." Memorandum from Don Dyke, Senior Staff Attorney, Wisconsin Legislative Council 2 (Apr. 21, 1998) (on file with Wisconsin Legislative Council).[10]

---

[9] The amendment to add the words "per occurrence" to Wis. Stat. § 895.04(4) was sponsored by Senator Robert Jauch, who worked closely with Senator Alice Clausing to develop an acceptable compromise on 1997 Senate Bill 148. *See* Senate Amendment 1 to Senate Substitute Amendment 3 to 1997 Senate Bill 148.

[10] Because this alteration to the statute was enacted after the Maurins brought their claim, each parent has a separate cause of action for wrongful death under the rule of *Jelinek*.

¶ 80. The amendment was necessary because the legislature increased the cap on noneconomic damages recoverable in actions alleging the wrongful death of a minor child to $500,000.[11] It raised the cap for the death of an adult to $350,000. *Id. See* Wis. Stat. § 895.04(4) (1997–98). The legislature responded to the pleas of an aggrieved parent, Barbara Schultz, who argued:

[11] Although the 1995 legislation capping noneconomic damages mollified the medical community, it infuriated groups representing victims of medical malpractice, especially parents who had lost children. They bombarded legislators with letters and phone calls asking for the elimination of, or at least an increase in, the new caps. *See, e.g.,* Steve Wideman, *Bereaved Parents Seek Accountability,* The Post-Crescent, Sept. 8, 1997, at B1; John Nichols, *Two Moms Take on Medical Lobby,* The Shepherd Express, July 3, 1997; Ed Culhane, *Victims of Malpractice Demand Their Day in Court,* The Post-Crescent, June 8, 1997, at B8. The efforts of these groups ultimately resulted in the "Justin-Lindsey Bill" referenced by the concurrence. Concurrence, ¶ 173. These groups believed that the 1995 legislation restoring damage caps limited their recovery to $150,000 —*not* $150,000 for wrongful death plus $350,000 for medical malpractice. *See, e.g.,* Letter from Barbara Schultz to Senator Alice Clausing (Jan. 22, 1997) (on file with Wisconsin State Historical Society) ("With the $150,000 cap, it is making it very hard for cases to even get to court. Why? Medical malpractice cases are very expensive. Attorneys sometimes turn down cases. The reason is, the experts testimonies, which are usually from Doctors, also must be paid.").

In another indication that the caps were not stackable, victims' groups pointed out the "scary thought" that "the legislators put a cap on medical negligence of $350,000 if you are alive and if you are killed only $150,000. *In other words it is cheaper to kill a patient than to keep that person alive.*" Letter from Barbara Schultz to senators and representatives, (undated) (on file with Wisconsin State Historical Society) (emphasis added).

"There's no way to police the medical profession anymore," Schultz said, pointing out that she can be sued for up to $1 million if she damages a patron's hair in her hair salon, but doctors can only be sued for $150,000 in a wrongful death case. "They should be as responsible as anyone else," Schultz said.

"Families: Wisconsin Wrongful Death Lawsuit Cap is Wrong," Dunn County News (undated), reprinted in *The Verdict* at 16–17 (Spring 1997). Schultz's equity argument served as an effective counterpoint to the argument made by the health care community in the mid-1990s.

¶ 81. We think it is improbable, however, that the legislature would have adjusted the wrongful death cap twice within a span of three years[12] if it thought claimants had access to the $350,000 indexed medical malpractice damage cap in § 893.55(4)(d), plus the $500,000/$350,000 wrongful death cap.[13]

---

[12] The 1995 legislation restored the limit on noneconomic damages in medical malpractice wrongful death cases to $150,000 (the limit provided in § 895.04(4)) and the 1997 legislation increased the limit on noneconomic damages in medical malpractice wrongful death cases to $500,000 (assuming the medical malpractice resulted in the wrongful death of a minor child).

[13] In a written statement to a legislative committee, Barbara Schultz wrote: "Two children died in a medical wrongful death and the [doctors] returned to work as usual. The families on the other hand do not have the same option. Our lives have been shattered. Then we find out there is a $150,000 cap on wrongful death. In May of 1995, the legislators put a cap on medical negligence of $350,000 if you are alive and if you are killed only $150,000. In other words it is cheaper to kill a patient than to keep that person alive. What a scary thought." Letter from Barbara Schultz to senators and representatives, (undated) (on file with Wisconsin State Historical Society).

¶ 82. The majority's single cap theory is supported by a series of court decisions.

¶ 83. "It is now firmly established that Chapter 655 constitutes the exclusive procedure and remedy for medical malpractice in Wisconsin." *Finnegan v. Patients Comp. Fund,* 2003 WI 98, ¶ 22, 263 Wis. 2d 574, 666 N.W.2d 797 (citing *Czapinski,* 236 Wis. 2d 316, ¶ 14; *Rineck,* 155 Wis. 2d at 665; *Strykowski;* 81 Wis. 2d at 499; *Ziulkowski v. Nierengarten,* 210 Wis. 2d 98, 102, 565 N.W.2d 164 (Ct. App. 1997)); *see also Jelinek,* 182 Wis. 2d at 9.

¶ 84. The *Jelinek* court said that Chapter 655 had "set tort claims resulting from medical malpractice apart from other tort claims." 182 Wis. 2d at 11. This is the complete answer to the otherwise legitimate argument that negligence claims and wrongful death claims are separate and distinct causes of action. *See* Concurrence, ¶ 129. The premise stated in *Jelinek* has been a pillar of medical malpractice law since 1975. "If the legislature did not intend to change the common law as to the damages that may be recovered in malpractice actions, there would have been no need for the legislature to enact the provision." *Lund v. Kokemoor,* 195 Wis. 2d 727, 736–37, 537 N.W.2d 21 (Ct. App. 1995).

¶ 85. *Lund v. Kokemoor* applied this principle to exclude punitive damages from medical malpractice claims. *Hegarty v. Beauchaine* used it to establish the statute of limitations on a wrongful death claim for medical malpractice. 2001 WI App 300, 249 Wis. 2d 142, 638 N.W.2d 355. The court held that "wrongful death claims that are the result of medical malpractice are subject to § 893.55." *Id.,* ¶ 21.

¶ 86. There are several passages in *Czapinski* that bear on the issue:

> [W]e hold that the language of Wis. Stat. § 893.55(4)(f) makes applicable to medical malpractice death cases only the limit on damages, and does not incorporate the wrongful death classification of claimants entitled to bring such an action.

236 Wis. 2d 316, ¶ 2.

> Statutory language along with legislative history and precedent lead us to hold that the intent of the legislature was to make applicable to medical malpractice death cases only the Wis. Stat. § 895.04(4) limit on damages.

*Id.,* ¶ 13; *see also* ¶¶ 16–17.

> Wis. Stat. § 893.55(4)(f) uses the language, "*damages* recoverable . . . are subject to the limit under s. 895.04(4)." (Emphasis added). This shows that the legislature intended to extend to medical malpractice suits the wrongful death limit on damages.

*Id.,* ¶ 21. The court noted that the repeated references to § 895.04(4) in Wis. Stat. § 893.55(4)(f) "connect 'limit' to damages." *Id.,* ¶ 20.

¶ 87. Although the *Czapinski* case involved a question about the eligibility of adult children or claimants for the wrongful death from medical malpractice in regard to their mother, the court's analysis accurately describes the operation of the statutes.

¶ 88. We conclude that the purpose and effect of Wis. Stat. § 893.55(4)(f) was to limit the noneconomic damages recoverable against health care providers for wrongful death in medical malpractice cases to the dollar amount listed in Wis. Stat. § 895.04(4). The limit in the latter statute supersedes the limit in Wis. Stat. § 893.55(4)(d) that would have applied but for the shift to a different limit.

¶ 89. In the immediate aftermath of the 1995 legislation, Wis. Stat. § 895.04(4) appears to combine the noneconomic damages from medical malpractice and the loss of society and companionship damages from wrongful death at a relatively modest level of $150,000. However, the evidence is compelling that key legislators understood that any eligible claimant under Wis. Stat. § 655.007 was entitled to make a separate claim for wrongful death damages in accord with our *Rineck* and *Jelinek* decisions. As previously noted, the legislature is presumed to act with knowledge of existing case law. As this court said in *Reiter v. Dyken,* "the presumption of legislative adoption or ratification of a judicial construction of a statute is entitled to less weight when the court's construction is followed by nearly complete inaction on the part of the legislature with respect to the statute construed," 95 Wis. 2d at 471, but the presumption is strong when the legislature takes specific responsive action to change a construction. The private memoranda from the Legislative Council to Rep. Mark Green, followed by the legislature's action inserting the words "per occurrence" into Wis. Stat. § 895.04(4) at the time the limits in § 895.04(4) were raised, is persuasive evidence that the legislature understood that the single cap in § 895.04(4) could be multiplied by the number of eligible claimants, before that amendment.

¶ 90. As a result, we believe the limit on noneconomic damages in this case is $300,000.

B. Constitutionality of the Limit on Wrongful Death Noneconomic Damages Arising Out of Medical Malpractice.

¶ 91. We now turn to the second certified question regarding the constitutionality of the limit on the recovery of noneconomic damages in wrongful death actions contained in Wis. Stat. § 895.04(4).

¶ 92. Above, we concluded that the cap on noneconomic damages under § 895.04(4) limits the total noneconomic damages when the cause of a wrongful death is medical malpractice. In practical terms, the global cap on total noneconomic damages intended by the legislature when medical malpractice causes death limits *both* wrongful death and medical malpractice simultaneously. The parents do not argue that it is unconstitutional to cap medical malpractice damages. *See Guzman,* 240 Wis. 2d 559. Thus, although we address it in a slightly different context, the certified question—whether the cap on wrongful death damages under § 895.04(4) is constitutional—is still relevant.

¶ 93. The constitutionality of a statute is a question of law that we review de novo. *Aicher,* 237 Wis. 2d 99, ¶ 18 (citing *Riccitelli v. Broekhuizen,* 227 Wis. 2d 100, 119, 595 N.W.2d 392 (1999)). Because statutes embody the economic, social, and political decisions entrusted to the legislature, we afford statutes a strong presumption of constitutionality. *Id.,* ¶ 20 (citing *State ex rel. Carnation Milk Prods. Co. v. Emery,* 178 Wis. 147, 160, 189 N.W. 564 (1922)). Accordingly, we uphold the constitutionality of a statute unless the party chal-

68

lenging the statute demonstrates that it is unconstitutional beyond a reasonable doubt. *Id.,* ¶ 19.[14]

¶ 94. For many years, "the legislature [has] made a deliberate judgment regarding what maximum amount could be awarded by statute for the loss of society and companionship." *Neiman* 236 Wis. 2d 411, ¶ 26.[15] The present action provides this court an opportunity to either validate the legislature's authority in this area or shatter the long held understanding of legislative power.

¶ 95. The constitutional arguments presented by the parents challenge the constitutionality of the cap in four respects. First, they assert that the cap nullifies the state constitutional right to have a jury assess damages under Wis. Const. Art. I, § 5. Second, they contend that § 895.04(4)'s cap violates separation of powers principles by blurring the boundaries between judicial and legislative branches. Third, they assert that the classifications dictated by § 895.04(4) violate constitutional equal protection guarantees. Finally, the parents posit that their constitutional rights to substantive due process have been violated by the creation of an

---

[14] In *Guzman v. St. Francis Hospital, Inc.,* 2001 WI App 21, 240 Wis. 2d 559, 623 N.W.2d 776, the court provides an exceptionally valuable and insightful discussion of the meaning and origin of this formulation. *Id.,* ¶ 4 n.3.

[15] *See Neiman v. Am. Nat. Prop. & Cas. Co.,* 2000 WI 83, ¶ 26 n.6, 236 Wis. 2d 411, 613 N.W.2d 160. The legislature has increased the statutory cap in a wrongful death claim on many occasions: § 1, ch. 548, Wis. Laws 1949; ch. 194, Wis. Laws 1959; ch. 436, Wis. Laws 1969; ch. 287, Wis. Laws 1975; ch. 166, Wis. Laws 1979; 1983 Wis. Act 315; 1991 Wis. Act 308; 1997 Wis. Act 89.

arbitrary, capricious, and unreasonable cap. Each of these arguments will be addressed in turn.[16]

[16] The concurrence concludes that the $300,000 limitation we have recognized in this case is unconstitutional. Yet, in *Schultz v. Natwick,* 2002 WI 125, 257 Wis. 2d 19, 653 N.W.2d 266, this court rejected the retroactive application of a $500,000 cap on wrongful death, thereby limiting the plaintiffs to a recovery of $150,000. The court considered the result "harsh," 257 Wis. 2d 19, ¶ 38, but there was no hint that the $150,000 cap was unconstitutional.

The concurrence is internally inconsistent. The concurrence insists that the wrongful death limitation, like a wrongful death claim, is distinct and separate from the limitation on noneconomic damages for medical malpractice. If we accept this premise, we would examine the effect of the wrongful death cap in isolation. The concurrence assumes that the limitation for wrongful death damages is $150,000. The jury awarded the parents $2.5 million. Consequently, by reducing the award from $2.5 million to $150,000, the overall reduction is $2,350,000, or 94 percent. Under our holding, the damage award is reduced from $3,050,000 ($2,500,000 + $550,000) to $300,000, a reduction of 90.2 percent. Given its analysis, it is not clear how the concurrence could uphold the $150,000 cap in isolation, and it is not clear why it eschews a 90.2 percent reduction but supports a 94 percent reduction. In the concurrence, nothing is clear about what limits are constitutional and what limits are not.

This sort of highly subjective analysis runs contrary to established procedure. "Courts are not equipped or empowered to make investigations into the financial resources of various public bodies in Wisconsin; the coverage, policy limits and costs of available liability insurance; or the number of victims of . . . tortfeasors and a profile of the losses they have suffered." *Stanhope v. Brown County,* 90 Wis. 2d 823, 844, 280 N.W.2d 711 (1979). The court in *Stanhope* was "unwilling to say that the legislature has no rational basis to fear that full monetary responsibility entails the risk of insolvency or intolerable tax burdens," *id.* at 842, but the concurrence is apparently willing to say that there is no rational basis here.

## 1. Trial by Jury

¶ 96. Article I, Section 5 of the Wisconsin Constitution provides in part that "[t]he right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy." According to the parents, Wis. Stat. § 895.04(4) infringes upon this right by nullifying the jury's damage-finding function. The parents correctly point out that the right to trial by jury includes the right to have "a jury trial on all issues of fact, including that of damages." *See Jennings v. Safeguard Ins. Co.*, 13 Wis. 2d 427, 431, 109 N.W.2d 90 (1961).

¶ 97. The parents develop an interesting, though ultimately irrelevant, historical argument. They assert that wrongful death actions are not statutory creations but existed at common law, thereby giving the right to jury trial in wrongful death actions constitutional imprimatur. Yet, even if we assume a constitutional right to a jury trial arising out of the common law status of wrongful death actions,[17] that right has not been deprived in this case.

¶ 98. There can be no claim that the parents' constitutional right to a trial by jury was *directly* infringed in this case because the case *was* tried to a jury, and the jury in fact decided the issue of damages.

---

[17] Even if wrongful death is an action that existed at common law, this would not preclude the legislature from altering the common law. *See* Wis. Const. art. XIV, § 13. Article XIV, section 13 provides that the common law "in force" at statehood "shall be and continue part of law of this state until altered or suspended by the legislature." In other words, the Wisconsin Constitution allows the legislature to alter or suspend claims based on the common law.

Rather the parents' argument relies upon an attenuated "infringement." In their view, by reining in the jury's discretion to award damages, the legislature has impermissibly trampled upon the jury's sacred domain.

¶ 99. However, "[e]ven when a defendant has a right to trial by jury he has no vested right to the manner or time in which that right may be exercised." *State ex rel. Murphy v. Voss,* 34 Wis. 2d 501, 509, 149 N.W.2d 595 (1967) (citing *State ex rel. Sowle v. Brittich,* 7 Wis. 2d 353, 96 N.W.2d 337 (1959)). As the court of appeals ably explained in the *Guzman* case, Article I, Section 5 of the Wisconsin Constitution distinguishes the respective roles of judge and jury. *Guzman,* 240 Wis. 2d 559, ¶ 10. It does not curtail the legislative prerogative to limit actions temporally, *see Aicher,* 237 Wis. 2d 99, or monetarily, *see Guzman,* 240 Wis. 2d 559. The cap on noneconomic wrongful death damages is an appropriate exercise of the "legislature's best judgment . . . as to what maximum amount of damages fully compensates for loss of society and companionship." *Neiman,* 236 Wis. 2d 411, ¶ 26.[18]

---

[18] The parents have not briefed the question whether the limitation on wrongful death claims violates Art. I, § 9 of the Wisconsin Constitution. The concurrence relies heavily on this section, repainting an old train in an attempt to lure new passengers. Article I, § 9, singly or in combination with Article I, § 5, does not bar the legislature from making rationally-based determinations about causes of action related to health care in Wisconsin. Limitations on noneconomic damages are not wholly different from prohibitions on punitive damages, periods of limitation on claims, and restrictions on claimants. Article I, § 9, "though of great importance in our jurisprudence, is primarily addressed to the right of persons to have access to the courts and to obtain justice on the basis of the law as it in fact exists.

72

¶ 100. We do not find that legislative suspension of damages above and beyond a certain limit infringes upon the right to a jury trial when, in wrongful death actions, a jury still determines liability and assesses damages. The parents have failed to demonstrate that § 895.04(4) violates our federal or state constitutional provisions beyond a reasonable doubt.

2. Separation of Powers

¶ 101. The parents also advance the position that the legislature has seized judicial power by enacting legislation that curtails the judicial power of remittitur and additur. The parents contend that the cap on noneconomic damages in wrongful death cases has superseded the judicial power to add or remit damages. As a result, the legislature has usurped judicial power.

¶ 102. In assessing whether the cap in § 895.04(4) violates separation of powers in this case, our first task is to determine whether the alleged usurpation invades a core power of the judicial branch or whether the power is one shared by the branches. *See Flynn v. Dep't of Admin.*, 216 Wis. 2d 521, 545–46, 576 N.W.2d 245 (1998). If the power is a core power of one branch, then other branches may not intrude upon that power. *Id.* If, on the other hand, the power is one that is shared between or among branches, then one branch may not unduly burden or substantially interfere with the other branch's exercise of that power. *Id.* As we understand

No legal rights are conferred by this portion of the constitution." *Mulder v. Acme-Cleveland Corp.*, 95 Wis. 2d 173, 189, 290 N.W.2d 276 (1980). Article I, § 9 cannot be used to enlarge a restricted cause of action.

the parents' argument, remittitur and additur are core judicial powers. We disagree.

¶ 103. When it comes to creating, limiting, and suspending causes of action, the legislature *shares* power with the judiciary. *See e.g.,* Wisconsin Stat. ch. 102 (Worker's Compensation Act); *Borgnis v. Falk Co.,* 147 Wis. 327, 133 N.W. 209 (1911). We have noted in the past that the legislature is specifically authorized to act in the context of wrongful death. *See Rineck,* 155 Wis. 2d at 669 ("As an element of common law, the doctrine permitting recovery for loss of society and companionship was initially created and developed by courts of law. . . . Thus, this is an area where *either this court or the legislature may act.*" (emphasis added)). The legislature's authority flows from its power to alter or suspend the common law. Wis. Const. Art. XIV, § 13; *see also State v. Picotte,* 2003 WI 42, ¶ 10, 261 Wis. 2d 249, 661 N.W.2d 381. Accordingly, the appropriate separation of powers inquiry is whether the legislature has unduly burdened or substantially interfered with judicial power.

¶ 104. The limit on noneconomic damages for wrongful death does not prevent a circuit court from exercising the powers of remittitur and additur. *See Guzman,* 240 Wis. 2d 559, ¶ 13 (holding that despite cap on noneconomic damages in medical malpractice cases, "a trial court retains the discretion . . . to order a remittitur"). In all, the burden on the court's remittitur and additur powers is minimal and is insufficient to demonstrate that the statute violates the separation of powers beyond a reasonable doubt.

### 3. Equal Protection

¶ 105. The parents argue that § 895.04(4) violates equal protection under a strict scrutiny standard and under a rational basis test. As an initial matter, we note that strict scrutiny is not appropriate in this context. Strict scrutiny applies if the statute implicates a fundamental right or creates a non-favored class of people who have immutable personal characteristics or have experienced a historical pattern of discrimination and political powerlessness. *Czapinski,* 236 Wis. 2d 316, ¶ 28. Capping noneconomic wrongful death damages does not violate any fundamental right possessed by the parents. Section 895.04(4) does not deny claimants access to the courts or an opportunity for a jury trial to recover wrongful death damages. Neither does the statute create classifications based on immutable personal characteristics or a history of discrimination or political powerlessness.

¶ 106. Thus, we review the parents equal protection challenge under the rational basis test. A statute will be held constitutional "if the legislature's distinction among groups of persons is rationally related to a legitimate government purpose." *Doering v. WEA Ins. Group,* 193 Wis. 2d 118, 131, 532 N.W.2d 432 (1995). Conversely, a statute will be held unconstitutional under the rational basis test if the statute is shown to be "patently arbitrary" with "no rational relationship to a legitimate government interest." *State v. Dennis H.,* 2002 WI 104, ¶ 32; 255 Wis. 2d 359; 647 N.W.2d 851 (quoting *State v. McManus,* 152 Wis. 2d 113, 131, 447 N.W.2d 654 (1989)).

¶ 107. First, we set forth the legislative classification created by § 895.04(4). *Doering,* 193 Wis. 2d at 137. The noneconomic damages cap for wrongful death creates two classes of victims—those that die and those that survive—and two classes of tortfeasors—those whose actions cause death and those whose actions do not cause death. These classifications are not irrational. In fact, they produce varying results in relation to the cap on noneconomic damages for wrongful death, depending upon the circumstances.

¶ 108. Next, we identify the objectives of the cap on noneconomic wrongful death damages.[19] *Id.* The cap on noneconomic wrongful death damages under § 895.04(4) was implemented to assuage fears "that passion would run high where the wrongdoer causes death and that huge damage awards would be imposed on the wrongdoer." *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 314, 294 N.W.2d 437 (1980). The Wisconsin legislature concluded, after taking into account economic, social, and political considerations, *see Aicher,* 237 Wis. 2d 99, ¶ 20, that a fair and equitable system considers not only the victim's survivors but also the overall cost of wrongful death awards on the system of health care providers that is vital to the people of Wisconsin. This determination is buttressed by the legislative findings presented in the Appendix. The legislature has pursued a legitimate objective in its quest to balance important considerations.

---

[19] We note that the legislative objective supporting the existence of a wrongful death cause of action is to provide "compensation to designated beneficiaries for their loss of relational interest with the deceased person." *Harris v. Kelley,* 70 Wis. 2d 242, 253, 234 N.W.2d 628 (1975) (citing *Wurtzinger v. Jacobs,* 33 Wis. 2d 703, 148 N.W.2d 86 (1967)).

¶ 109. Finally, we consider whether the legislative classification is rationally related to the achievement of an appropriate legislative objective. *Doering,* 193 Wis. 2d at 137–38. In this instance, capping noneconomic wrongful death damages is undeniably related to the legitimate legislative objective sought to be accomplished by the cap. Indeed, it is hard to conceive a more rational means of assuaging the fear of huge damage awards and reining in insurance costs in the case of a victim's death than by limiting noneconomic wrongful death damages. Given the presumption of constitutionality, this statute does not run afoul of our federal and state equal protection guarantees beyond a reasonable doubt.

4. Substantive Due Process

¶ 110. Finally, the parents argue that the cap on wrongful death damages violates federal and state substantive due process, because it is arbitrary, capricious, and unreasonable. *See State v. Radke,* 2003 WI 7, ¶ 12, 259 Wis. 2d 13, 657 N.W.2d 66. The Fourteenth Amendment to the United States Constitution and art. I, § 1 of the Wisconsin Constitution coextensively guarantee due process of law. *See Dowhower v. West Bend Mutual Ins. Co.,* 2000 WI 73, ¶ 12, 236 Wis. 2d 113, 613 N.W.2d 557. Due process constitutes more than just a guarantee of fair process, but also encompasses substantive protections that bar "certain government actions regardless of the fairness of the procedures used to implement them." *Id.,* ¶ 13 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 840 (1998)).

¶ 111. The parents claim that, over the years, the legislature has changed the cap in a random and arbitrary manner. According to the parents, "[t]hese continual amendments show that the cap has no basis in fact and is completely arbitrary." Certainly the legislature has adjusted the cap on noneconomic wrongful death damages from time to time. This does not lead inexorably to the conclusion that such changes did not reflect the legislature's considered judgment. The periodic changes to the cap noted by the parents suggest legislative attention and thoughtfulness, not arbitrary action. It is the legislature's role to seek an equitable level of compensation, and occasional reassessment and alteration of the cap on noneconomic wrongful damages demonstrates the legislature's attempts to reach that goal.

¶ 112. We conclude that the limit on noneconomic damages for medical malpractice wrongful death, as set out in Wis. Stat. § 895.04(4), is not unconstitutional.

C. Remittitur

¶ 113. The jury awarded $550,000 to Shay Maurin's estate for her pre-death pain and suffering. The circuit court remitted this amount to $100,000. The parties dispute whether the court erroneously exercised its discretion.

¶ 114. The jury also awarded the parents $2,500,00 as wrongful death damages for their loss of society and companionship. This amount must be reduced to $300,000 to comply with the limit set out in Wis. Stat. § 895.04(4).

¶ 115. Under our decision, the total amount of allowable noneconomic damages for the parents and the estate is $300,000. Consequently, whether the

estate's verdict of $550,000 is reduced to $381,428 by law or $100,000 by remittitur will have no bearing on the ultimate award. Consequently, we decline to review the issue.

## CONCLUSION

¶ 116. We uphold the constitutionality of the non-economic damage limit in Wis. Stat. § 895.04(4) as the limit on total noneconomic damages recoverable from health care providers in a medical malpractice wrongful death case. This limit combines the damages available for medical malpractice and wrongful death. In this case, for the reasons explained in our decision, the plaintiffs are entitled to recovery of $300,000. Accordingly, the decision of the circuit court is reversed and the cause remanded for action consistent with this decision.

*By the Court.*—The judgment of the circuit court is reversed and the cause is remanded to the circuit court for proceedings consistent with this opinion.

## APPENDIX

Section 1. Legislative findings. (1) The legislature finds that:

(a) The number of suits and claims for damages arising from professional patient care has increased tremendously in the past several years and the size of judgments and settlements in connection therewith has increased even more substantially;

(b) The effect of such judgments and settlements, based frequently on newly emerging legal precedents, has been to cause the insurance industry to uniformly and substantially increase the cost and limit the availability of professional liability insurance coverage;

79

(c) These increased insurance costs are being passed on to patients in the form of higher charges for health care services and facilities;

(d) The increased costs of providing health care services, the increased incidents of claims and suits against health care providers and the size of such claims and judgments has caused many liability insurance companies to withdraw completely from the insuring of health care providers;

(e) The rising number of suits and claims is forcing both individual and institutional health care providers to practice defensively, to the detriment of the health care provider and the patient;

(f) As a result of the current impact of such suits and claims, health care providers are often required, for their own protection, to employ extensive diagnostic procedures for their patients, thereby increasing the cost of patient care;

(g) As another effect of the increase of such suits and claims and the costs thereof, health care providers are reluctant to and may decline to provide certain health care services which might be helpful, but in themselves entail some risk of patient injury;

(h) The cost and the difficulty in obtaining insurance for health care providers discourages and has discouraged young physicians from entering into the practice of medicine in this state;

(i) Inability to obtain, and the high cost of obtaining, such insurance has affected and is likely to further affect medical and hospital services available in this state to the detriment of patients, the public and health care providers;

(j) Some health care providers have curtailed or ceased, or may further curtail or cease, their practices

80

because of the nonavailability or high cost of professional liability insurance; and

(k) It therefore appears that the entire effect of such suits and claims is working to the detriment of the health care provider, the patient and the public in general.

§ 1, ch. 37, Laws of 1975.

¶ 117. SHIRLEY S. ABRAHAMSON, C.J., and N. PATRICK CROOKS, J. (*concurring*). This is a statutory interpretation case that affects the entire health care community and everyone in the state because we all have been or will be patients. The plaintiffs and amicus urge one interpretation of the statutes; the defendants and amicus urge another. The majority opinion adopts neither.

¶ 118. Rather, the majority has heard a different drumbeat and follows it, adopting an interpretation of the statutes totally different from any argued or briefed here or in the court of appeals.

¶ 119. Some justices proceed to make decisions without benefit of arguments or briefs by the parties. Others prefer more restraint. Some justices apparently perceive that the rule of law is advanced by a sua sponte approach. We do not.

¶ 120. This case should not be decided without asking the parties to brief the majority opinion's novel interpretation of the statutes and to reargue the case. We urge the majority to seek supplemental briefs from the parties before promulgating its novel interpretation of the statutes. The rule of law is generally best

developed when matters are tested by the fire of adversarial briefs and oral arguments.[1]

¶ 121. This court has emphasized its "preference for requesting briefs whenever they might aid the court"[2] and has acknowledged that "statutory interpretation is an area in which the courts usually should be willing to delay their determination until they have the assistance of briefs."[3] Indeed, a court's sua sponte determination of an issue may raise due process considerations: A court may be depriving parties of their

---

[1] "The fundamental premise of the adversary process is that these advocates will uncover and present more useful information and arguments to the decision maker than would be developed by a judicial officer acting on his own in an inquisitorial system." Adam A. Milani & Michael R. Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts,* 69 Tenn. L. Rev. 245, 247 (2002) (citing *United States v. Burke,* 504 U.S. 229, 246 (1993) (Scalia, J., concurring)).

[2] *Bartus v. DHSS,* 176 Wis. 2d 1063, 1073, 501 N.W.2d 419 (1993).

[3] *Id.*

*See also* Allan D. Vestal, *Sua Sponte Consideration in Appellate Review,* 27 Ford. L. Rev. 477, 493–94 (1958–59):

> When the appellate court considers a matter sua sponte for the first time it means that the litigants have not been given an opportunity to consider the matter and urge arguments in support of and against the position adopted by the reviewing court. If the question had been raised there is at least a possibility that other facts or other authorities might have been presented which might have changed the court's attitude on the matter. But this opportunity is not given to the losing party.

> When considered sua sponte both parties are taken completely by surprise and the court decides the matter on grounds not urged by either. Neither has had any opportunity to consider the matter, and both are now bound by res judicata grounded on considerations which represent not well reasoned positions for the litigants, but rather only the fortuitous decision of a wayward court.

right to a meaningful appeal, to due process notice, and to adversary counsel.[4] If there ever was a case that cried out for briefs from adversarial parties to assist the court, this statutory interpretation case is it. We are at a loss to understand why the majority refuses to call for additional briefs.

¶ 122. The majority opinion derives its interpretation of the statutes by piecing together (in a convoluted manner) selected parts of the statutory texts, the medical malpractice "crisis," statutory history, legislative history of enacted laws and defeated bills (including private communications between a legislator and staff), arguments of proponents and opponents in lobbying for bills, and case law interpreting earlier statutes.

¶ 123. We rely on the briefs and oral argument for our discussion of the proper statutory interpretation and remittitur. Notwithstanding the lack of briefing on the constitutionality issue the majority's novel interpretation raises, and recognizing that we, like the majority, would benefit by hearing from the litigants, we nevertheless explore the unconstitutionality of the majority's novel interpretation using the information we now have.

¶ 124. We agree with the majority opinion that the judgment of the circuit court must be reversed and remanded.

¶ 125. The majority opinion and this concurrence vigorously disagree about the interpretation of the applicable statutes. On remand, the defendants' liabil-

---

[4] *Cf. Lankford v. Idaho,* 500 U.S. 110, 120, 111 S. Ct. 1723 (1991) (invalidating a death penalty on due process grounds because "the silent judge was the only person in the courtroom who knew that the real issue that they [counsel] should have been debating was the choice between life and death").

ity and the plaintiffs' recovery are significantly different under the majority opinion and this concurrence.

¶ 126. The majority opinion and this concurrence focus on the limits on noneconomic damages in medical malpractice actions resulting in death and the cap on loss of society and companionship in wrongful death actions. Economic damages are not capped in medical malpractice actions[5] and pecuniary damages are not capped in wrongful death actions.[6] We therefore do not focus on these damages.

¶ 127. We present the concurrence as follows: We first discuss the fundamental legal flaw underlying the majority's reasoning and analyze the majority's statutory interpretation in light of this flaw. We then set forth our own interpretation of the statutes, an interpretation that coincides with that of the plaintiffs. Finally, we conclude that the majority's interpretation of the statutes is unconstitutional and that the remittitur was an erroneous exercise of discretion.

I

¶ 128. A fundamental legal flaw pervades the majority's concocted interpretation of Wisconsin's medical malpractice and wrongful death statutes. It permeates and distorts the majority's view of the statutes.

[5] Majority op., ¶ 27.
[6] Wis. Stat. § 895.04(4).

¶ 129. The flaw: The majority opinion fails to recognize the simple yet well-established distinction between a survival action and an action for wrongful death.[7] This distinction has been recognized repeatedly in Wisconsin.[8]

---

[7] At common law, upon the death of a person injured by the fault of another, any action brought for the injury and any right of action brought for the injury and any right of action therefor died with the person. By statutes adopted in most states, this rule has been changed, and the action for the injuries sustained up until the time of death may be maintained by the personal representative. These are known as Survival Acts.

By another common-law rule, neither the members of the family of the injured person nor his personal representatives had any cause of action for the loss occasioned by his death. This also has been changed, in all the states, by statutes, which are modeled upon Lord Campbell's Act adopted in England in 1846, and are known as Death Acts.

Charles T. McCormick, *Damages* 335 (1935).

[8] *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 312, 294, N.W.2d 437 (1980) (estate's award for child's pain a suffering and beneficiaries' recovery for wrongful death "is not a double recovery, but a recovery for a double wrong"); *Estate of Merrill ex rel. Mortenson v. Jerrick,* 231 Wis. 2d 546, 549, 605 N.W.2d 645 (Ct. App. 1999) ("A survival action is distinct from a wrongful death action."); *Miller v. Luther,* 170 Wis. 2d 429, 435–36, 489 N.W.2d 651 (Ct. App. 1992) ("A wrongful death action is a cause of action for the benefit of certain designated classes of surviving relatives, enabling them by statute to recover their own damages caused by the wrongful death of the decedent . . . It is not an action that survives the decedent's death; it is a new action brought for the benefit of the statutory beneficiaries."); *Jaeger v. Raymark Indus., Inc.,* 610 F. Supp. 784, 786 (E.D. Wis. 1985) ("The survival action and the wrongful death action are distinct under Wisconsin law. The survival action is brought by the decedent's estate for the injury to the decedent; the wrongful death action belongs to the named

¶ 130. Let us illustrate the distinction. When a victim dies, some claims are for pre-death noneconomic damages suffered by the victim (*e.g.,* pain and suffering) and others are for pre-death noneconomic damages suffered by family members of the victim (*e.g.,* a spouse's loss of consortium). These are generally referred to as survival actions.[9]

¶ 131. In contrast, damages for post-death injuries fall within the wrongful death statute. The wrongful death statute limits noneconomic damages to loss of society and companionship and caps these damages. Wrongful death claims do not encompass other types of noneconomic damages.[10]

¶ 132. In ordinary tort actions, the victim and the family recover unlimited "survival" damages, and the family recovers the capped "loss of society and companionship" damages.[11]

¶ 133. Yet according to the majority opinion, in medical malpractice actions when death results, both types of damages, survival damages and wrongful death damages, are limited to the cap set forth in the wrongful death statute even though the wrongful death statute addresses only damages for loss of society and companionship.[12] This conclusion is surprising in light of the fact that the majority can point to no evidence anywhere to show that anyone at any time has interpreted the cap for wrongful death damages to encom-

---

beneficiaries for their injury. '[T]he latter action begins where the former ends' " (citations omitted)).

[9] 2 Dan B. Dobbs, *The Law of Torts* § 295. *See, e.g.,* Wis JI—Civil 1815, 1855.

[10] Wis. Stat. § 895.04(4).

[11] *Id.*

[12] Majority op., ¶ 31.

pass anything else besides damages for loss of society and companionship. The whole focus of legislative activity was to limit recovery for loss of society and companionship, not to limit recovery for other noneconomic damages suffered in wrongful death medical malpractice cases. Furthermore, neither the text of the statute nor the majority opinion instructs the parties or courts on how to allocate noneconomic damages when, as in this case, noneconomic damages for the survival action and the wrongful death action exceed the wrongful death cap on loss of society and companionship, or how comparative negligence applies to each type of action.[13]

¶ 134. The majority argues that the plain words of the statute and its interpretation of the legislative history compel it to override this basic legal principle differentiating between survival actions and wrongful death actions. However, neither the text nor the legislative history nor the legislative objective nor the case law compels this strange reading.

¶ 135. For example, the majority cites the following statutory language in Wis. Stat. § 893.55(4)(b), emphasizing "total," "or death," and "for each occurrence" in support of its theory:

> The *total* noneconomic damages recoverable for bodily injury *or death,* including any action or proceeding based on contribution or indemnification, may not exceed the limit under par. (d) *for each occurrence* on or after May 25, 1995, from all health care providers and all employees of health care providers acting within the

---

[13] Compare Wis. Stat. § 893.55(5) and Wis. Stat. § 895.04(7).

scope of their employment and providing health care services who are found negligent and from the patients compensation fund.[14]

¶ 136. The majority concludes that the words "total" and "for each occurrence" reveal that the legislature intended a single recovery for each incident or "occurrence" involving medical malpractice.[15] Furthermore, the majority concludes that the words "or death" show that the legislature intended to provide a single recovery even when the medical malpractice resulted in a wrongful death.[16]

¶ 137. The majority goes astray when it equates the word "death" with a cause of action for wrongful death. In the *Rineck* case, the court interpreted "bodily injury or death" in Wis. Stat. § 893.55(4)(b).[17] The court held that the wrongful death statute had no application to medical malpractice as the statutes were then drafted. The words "bodily injury or death" in § 893.55(4)(b) were the only words that could be construed as applying to medical malpractice personal injury actions, survival actions, and wrongful death actions.

¶ 138. The words "bodily injury or death" in Wis. Stat. § 893.55(4)(b) have to be interpreted in light of the addition of § 893.55(4)(f), relating to wrongful death. The addition of § 893.55(4)(f) was probably prompted by the *Rineck* decision. The adoption of § 893.55(4)(f) was meant to undo *Rineck* so that the word "death" in Wis. Stat. § 893.55(4)(b) no longer references a cause of

---

[14] Wis. Stat. § 893.55(4)(b).

[15] Majority op., ¶ 23.

[16] *Id.*

[17] *Rineck v. Johnson*, 155 Wis. 2d 659, 456 N.W.2d 336 (1990).

action for "wrongful death." As a result of the adoption of § 893.55(4)(f), § 893.55(4)(b) governs the cap for noneconomic damages in medical malpractice actions except that § 895.04(4) governs the cap on loss of society and companionship in medical malpractice wrongful death actions.

¶ 139. In fact, when the term "wrongful death" *is used* in Wis. Stat. § 893.55(4)(f), the applicable statutory language states that the limits contained in Wis. Stat. § 893.55(4) (the medical malpractice cap) *do not* apply. Section 893.55(4)(f) reads as follows:

> *Notwithstanding* the limits on *noneconomic* damages under this subsection [§ 893.55(4)], damages recoverable against health care providers ... *for wrongful death* are subject to the limit under s. 895.04(4)(emphasis added).[18]

¶ 140. The majority argues that we interpret the word "notwithstanding" to mean "in addition to" instead of "in spite of."[19] Nonsense! To the contrary, we read the statute as follows: In spite of the limits set forth in Wis. Stat. § 893.55(4) relating to noneconomic damages (statutorily defined to include a long list of noneconomic damages),[20] *damages* recoverable against health care providers *for wrongful death,* that is, for loss of society and companionship, are subject to the limit

---

[18] Wis. Stat. § 893.55(4)(f).

[19] Majority op., ¶ 36.

[20] Wisconsin Stat. § 893.55(4)(a) states:

In this subsection, "noneconomic damages" means moneys intended to compensate for pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well—being or bodily functions; loss of consortium, society and companionship; or loss of love and affection.

under § 895.04(4). The only noneconomic damages for wrongful death are damages for loss of society and companionship.

¶ 141. In contrast, the majority rewrites paragraph (4)(f) of Wis. Stat. § 893.55 to state that when death is caused by medical malpractice, the limit on all noneconomic damages defined in § 893.55(4)(a) is no longer governed by § 893.55(4); instead all noneconomic damages in medical malpractice are limited to whatever the limit is set forth for the loss of society and companionship in wrongful death actions. But of course that is not what the text of the statute says.

¶ 142. Wisconsin Stat. § 893.55(4)(f) specifically identifies *damages for wrongful death* (the only such damages being damages for loss of society and companionship) and directs us toward that wrongful death statute to determine the applicable limits on *damages for wrongful death.* The statute does not read, as the majority would have it read, that in the event of a patient's death, the cap set forth in the wrongful death statute for loss of society and companionship applies to all noneconomic damages listed in the medical malpractice statute. If the legislature intended to so provide, the statute would have been drafted to read simply as follows: "Notwithstanding the limits on noneconomic damages under this subsection, in the event of the death of a patient caused by medical malpractice, all noneconomic damages recoverable against health care providers . . . would be subject to the limit under s. 895.04(4)."

¶ 143. The majority opinion fails to distinguish between the phrase "noneconomic damages" broadly defined in the medical malpractice statute (Wis. Stat. § 893.55(4)(a)) and damages for loss of society and companionship, the only noneconomic damages recov-

erable in wrongful death actions. The majority opinion just ignores the difference and conflates the two.[21]

¶ 144. The majority opinion does this in spite of the fact that the prefatory note to the bill that created Wis. Stat. § 893.55(4)(f) (an explanatory note in plain language required by statute to be printed and to accompany a bill when introduced)[22] explains that claims for loss of society and companionship in medical malpractice wrongful death would be treated in the same manner as claims in other civil actions involving death, meaning that the award would be for loss of society and companionship:

> The bill limits the damages *for loss of society and companionship* that may be recoverable in medical malpractice cases involving death to the $150,000 maximum currently *established for other civil actions involving death* (emphasis added).[23]

¶ 145. We should assume that a subsection that specifically references wrongful death, as does Wis. Stat. § 893.55(4)(f), should govern how damages for wrongful death, that is, damages for loss of society and companionship, are calculated with regard to that specific cause of action, irrespective of the limits on other causes of action contained in § 893.55(4). And this is certainly the case when preemptory language such as "notwithstanding" is used to separate that statutory provision from the rest of the subsection, as is the case here.

¶ 146. The majority also finds it significant that "loss of society and companionship" is contained in the

---

[21] *See, e.g.,* majority op., ¶ 69.

[22] Wis. Stat. § 13.92(1)(b)2.

[23] Legislative Reference Bureau Analysis of 1995 Assembly Bill 36.

definition of noneconomic damages set forth in Wis. Stat. § 893.55(4)(a), quoted at note 20 of this concurrence. However, the majority fails to recognize that a cause of action for loss of society and companionship can be raised for the period of time in which a patient was incapacitated before death and does not refer exclusively to post-death loss of society and companionship, damages that are covered in wrongful death actions.[24] For *damages for loss of society and companionship in wrongful death,* the more specific statute is Wis. Stat. § 893.55(4)(f), and that statute should govern here, *notwithstanding* (that is, in spite of) any provision contained in Wis. Stat. § 893.55(4) governing other noneconomic damages.[25]

¶ 147. The majority's fundamental failure to recognize the distinction between survival actions and actions in wrongful death also permeates its interpretation of the legislative history. The majority argues that by enacting Wis. Stat. § 893.55(4)(f), the legislature, reacting to our decisions in *Rineck*[26] and *Jelinek,*[27] intended merely to place medical malpractice wrongful

---

[24] *See* Wis JI—Civil 1815 (loss of consortium includes "companionship and society"); *see also Fitzgerald v. Meissner & Hicks, Inc.,* 38 Wis. 2d 571, 157 N.W.2d 595 (1968).

[25] *See State ex rel. Hensley v. Endicott,* 2001 WI 105, ¶ 21, 245 Wis. 2d 607, 627, 629 N.W.2d 686 (citing *Martineau v. State Conservation Comm'n,* 46 Wis. 2d 443, 449, 175 N.W.2d 206 (1970)) (that a specific statute controls over a general statute "is especially true when the specific statute is enacted after the general statute").

[26] *Rineck v. Johnson,* 155 Wis. 2d 659, 456 N.W.2d 336 (1990).

[27] *Jelinek v. St. Paul Fire & Cas. Ins. Co.,* 182 Wis. 2d 1, 512 N.W.2d 764 (1994).

death claims "on the same footing" as other wrongful death claims.[28] Absolutely. We agree with the majority.

¶ 148. Ironically, the majority's own interpretation of the statutes is inconsistent with the very legislative purpose the majority proffers.[29] The majority opinion defeats the legislature's attempt to attain parity between wrongful death claims in tort cases generally and wrongful death claims in medical malpractice cases.

¶ 149. Under the majority's interpretation, the wrongful death cap for loss of society and companionship supersedes the medical malpractice cap for all noneconomic damages if the patient dies. Wrongful death claimants are thus forced to share their limited recovery with those entitled to recover damages under survival actions. In this sense, wrongful death claims in medical malpractice actions are not "on the same footing" as other wrongful death claims in other tort actions. Recoveries for wrongful death claimants in medical malpractice cases are more severely limited.

¶ 150. This result is apparent in the case before us today. The parents will be forced to relinquish either their full wrongful death award or the estate's award for pre-death pain and suffering because the total recovery for all damages exceeds $300,000, even though the statute specifically states that the caps on damages *for wrongful death* (loss of society and companionship) are set forth in Wis. Stat. § 895.04(4) *notwithstanding* the limits contained in Wis. Stat. § 893.55(4).[30]

---

[28] Majority op., ¶ 69.

[29] *Id.*

[30] Parity is attained in the interpretation we adopt:

In tort actions involving death, except medical malpractice actions, noneconomic pre-death damages are not limited;

¶ 151. The majority's reliance on case law also falls well short of the mark. The majority opinion snips language from various court decisions and quotes passages out of context to support its theory.[31] It starts with *Jelinek*,[32] which is inapplicable to our case because it was decided when no caps existed in medical malpractice cases and before Wis. Stat. § 893.55(4)(f) was enacted.

¶ 152. The majority then lifts language from *Lund v. Kokemoor*.[33] But *Lund* had to do with whether punitive damages were recoverable in medical malpractice lawsuits. The language lifted from *Lund* is of no value here.

¶ 153. The majority cites *Hegarty v. Beauchaine*[34] in support of its theory. *Hegarty* is inapplicable, however, because it involved a dispute over which statute of limitations applied in a medical malpractice case involving wrongful death. Since there is no similar provision to Wis. Stat. § 893.55(4)(f) directing us away from the medical malpractice statute in order to determine the

---

wrongful death damages are limited to damages for loss of society and companionship and capped at $150,000.

In medical malpractice tort actions, noneconomic pre-death damages are capped at $350,000; wrongful death damages are limited to damages for loss of society and companionship and capped at $150,000.

[31] Majority op., ¶¶ 83–87.

[32] *Jelinek v. St. Paul Fire & Cas. Ins. Co.*, 182 Wis. 2d 1, 512 N.W.2d 764 (1994).

[33] *Lund v. Kokemoor*, 195 Wis. 2d 727, 537 N.W.2d 21 (Ct. App. 1995).

[34] *Hegarty v. Beauchaine*, 2001 WI App 300, 249 Wis. 2d 142, 638 N.W.2d 355.

appropriate statute of limitations in a medical malpractice action for wrongful death, the *Hegarty* decision also is of no value here.

¶ 154. Finally, the majority's reliance on *Czapinski*[35] also is misplaced. First of all, *Czapinski* merely acknowledges that the wrongful death cap is applicable to medical malpractice cases, and says nothing about *how* the cap applies. *Czapinski* had to do with determining who was eligible to bring a cause of action for wrongful death in a medical malpractice case, and not with the amount of damages those claimants could recover. Thus, *Czapinski* also is of no value here.

¶ 155. We prefer to rely on authority that is directly on point rather than quoting passages from prior case law out of context. When we follow this steadfast principle it is apparent that nobody has ever interpreted the wrongful death cap as encompassing anything other than damages for loss of society and companionship, even in medical malpractice cases. Indeed, the well-respected treatise on damage law in Wisconsin has interpreted the statutes as exempting wrongful death damages for loss of society and companionship from the medical malpractice cap for noneconomic damages, writing as follows:

> The legislature has limited an injured plaintiff's right to recover damages for pain and suffering in claims against health care providers. A $350,000 cap (to be adjusted at least annually by the director of state courts to reflect changes in the consumer price index) was imposed, effective May 25, 1995, on non-economic damages, defined to include pain and suffering, in medical negligence cases in which the claim accrued on or after the statute's effective date. Wis. Stat.

[35] *Czapinski v. St. Francis Hosp., Inc.*, 2000 WI 80, 236 Wis. 2d 316, 613 N.W.2d 120.

§§ 893.55(4)(a),(d); 655.017. *Wrongful death claims are excepted from this non-economic loss cap. Wis. Stat. § 893.55(4)(f)* (emphasis added).[36]

¶ 156. The majority's misinterpretation of the law also is evident in its surprising holding that each parent may collect the full amount under the wrongful death cap for loss of society and companionship.

¶ 157. In a possible attempt to save face and avoid the absurd result compelled by its interpretation of the medical malpractice and wrongful death statutes that the total recovery available for the survival actions and the wrongful death action is a mere $150,000, the majority conjures up an interpretation of the wrongful death statute that allows each parent in this case to recover a full $150,000 under the wrongful death statute.

¶ 158. The majority cannot produce any evidence that anyone has ever applied the wrongful death cap in tort actions generally or in medical malpractice actions specifically in the way they interpret Wis. Stat. § 893.55(4)(f), that is, that the wrongful death cap applies to each parent's claim rather than both parents' claims in the aggregate.

¶ 159. In support of its argument the majority offers us nothing except two private communications between a member of the legislative council staff and one legislator, Mark Green, identified by the majority as "key legislators."[37] The private memoranda cited by the majority fail to provide any evidence, let alone "compelling" evidence (as the majority opinion characterizes the

[36] 1 *The Law of Damages in Wisconsin* § 5.5, at 3 n.1 (Russell M. Ware ed., 3d ed. 2003).
[37] Majority op., ¶ 89.

memoranda)[38] that in wrongful death actions arising from medical malpractice in the case of a minor child, each parent can recover the full amount of the cap. Nor does the majority ever show that "key legislators understood that any eligible claimant under Wis. Stat. § 655.007 was entitled to make a separate claim for wrongful death damages . . . ."[39]

¶ 160.　In fact, one private memorandum cited by the majority to justify its reading of the statute states only that:

> *It is arguable* that the causes of action for loss of society and companionship in medical malpractice actions for wrongful death are separate and the current $150,000 limit applies to each cause of action individually, not in the aggregate. [*Jelinek v. St. Paul Fire and Casualty Ins. Co.*, 182 Wis. 2d 1, 512 N.W.2d 764 (1994).] (emphasis added).[40]

¶ 161.　This same memorandum states that:

> *Presumably,* reference is made to "per occurrence" [in 1997 Wis. Act 89] to provide that in wrongful death medical malpractice actions, the limit is a total limit and does not apply individually to each person who may bring an action for loss of society and companionship (emphasis added).[41]

¶ 162.　The earlier private memorandum cited by the majority merely states as follows:

---

[38] *Id.*

[39] *Id.*

[40] Memorandum from Don Dyke, Senior Staff Attorney, Wis. Legis. Council (Apr. 21, 1998) (on file with Wisconsin Legislative Council).

[41] The 1998 memo states in full in pertinent part:

*1. Limitation on Recovery of Damages for Loss of Society and Companionship*

The causes of action [for loss of society and companion-ship in a medical malpractice action for wrongful death] *appear* to be separate—each surviving person allowed to bring an action may do so—and, *arguably,* the $150,000 limit applies to each cause of action individually, not in the aggregate. [*Jelinek v. St. Paul Fire and Casualty Ins. Co.,* 182 Wis. 2d 1, 512 N.W.2d 764 (1994).] (emphasis added).[42]

Act 89 replaces the current $150,000 limit on damages for loss of society and companionship in wrongful death actions with a $500,000 limit per occurrence in the case of a deceased minor or $350,000 per occurrence in the case of a deceased adult. The new limits apply both to wrongful death actions involving medical malpractice and to other wrongful death actions. Presumably, reference is made to "per occurrence" to provide that in wrongful death medical malpractice actions, the limit is a total limit and does not apply individually to each person who may bring an action for loss of society and companionship. (As noted above, in wrongful death actions not involving medical malpractice, s. 895.04(4), Stats., has already been interpreted as applying the current $150,000 limit in the aggregate.

[42] Memorandum from Don Dyke, Senior Staff Attorney, Wis. Legis. Council (Sept. 5, 1997) (on file with Wisconsin Legislative Council).

The 1997 memo states in pertinent part:

2. Medical Malpractice Actions

In a medical malpractice wrongful death action, damages for loss of society and companionship, are also subject to the $150,00 limit. [ss. 893.55(4)(f) and 895.04(4), Stats.] However, in a medical malpractice action for wrongful death, who may recover damages for loss of society and companionship and how the limit is applied may differ from wrongful death actions generally.

It appears that an action for loss of society and companionship in a medical malpractice action for wrongful death may be brought: (a) by a surviving spouse; (b) by a *minor* child of a deceased parent; and (c) by a parent of a deceased *minor* child. [See, for example, *Dziadosz v. Zirneski,* 177 Wis. 2d 59, 501 N.W.2d 828 (Ct. App. 1993).] The causes of action appear to be separate —each surviving person allowed to bring an action may do so and,

¶ 163. It is for good reason that the staff member chose the words "arguable," "presumably," "appear," and "arguably" with the reference to the *Jelinek* decision. When *Jelinek* was decided, no limits existed on noneconomic damages in medical malpractice actions. *Rineck* had previously decided that the wrongful death limits did not apply in medical malpractice. *Jelinek* affirmed that conclusion. Thus, before the enactment of Wis. Stat. § 893.55(4)(f), each claimant in a medical malpractice action was allowed to recover for his or her own loss of society and companionship as a separate action under the medical malpractice statute governing all noneconomic damages, not under the wrongful death statute.[43]

¶ 164. Interestingly enough, in its rush to present "compelling evidence" that "key legislators understood that any eligible claimant under Wis. Stat. § 655.007 was entitled to make a separate claim for wrongful death damages,"[44] the majority unwittingly provides us with compelling evidence supporting our interpretation of the statutes. The majority overlooks the fact that the analysis provided to Rep. Green by the staff member centers only on "damages for loss of society and companionship" and reflects an understanding that the cap

---

arguably, the $150,000 limit applies to each cause of action individually, not in the aggregate. [*Jelinek v. St. Paul Fire and Casualty Ins. Co.,* 182 Wis. 2d 1, 512 N.W.2d 764 (1994).]

Note that while 1995 Wisconsin Act 10 clearly applied the $150,000 limit on loss of society and companionship in wrongful death actions to medical malpractice actions, it arguably did not change the above-cited differences in who may recover loss of society and companionship damages in medical malpractice wrongful death actions and whether the limit is applied individually or in the aggregate. (emphasis in original).

[43] *See Jelinek,* 182 Wis. 2d at 8–9.
[44] Majority op., ¶ 89.

on wrongful death damages, even in cases of medical malpractice, consists only of damages for loss of society and companionship.[45] This fundamental legal principle that damages for wrongful death consist *only* of damages for loss of society and companionship, which was apparent to Rep. Green and a staff member, is lost on the majority of this court.

¶ 165. While Rep. Green might have been interested in putting an end to any uncertainty about the continued vitality of *Jelinek* and *Rineck* by inserting the language "per occurrence," this does not mean that anyone has ever, before today, interpreted the wrongful death statute to allow each parent to collect the full amount under the cap.

¶ 166. In fact, the prefatory note to the bill that created Wis. Stat. § 893.55(4)(f) (an explanatory note in plain language required by statute to be printed and to accompany a bill when introduced)[46] explains that claims for loss of society and companionship in medical malpractice wrongful death would be treated in the same manner as claims other civil actions involving death, meaning that the award would be available in the aggregate, not individually:

> The bill limits the damages *for loss of society and companionship* that may be recoverable in medical malpractice cases involving death to the $150,000 maximum currently *established for other civil actions involving death* (emphasis added).[47]

¶ 167. Such an explanation of the bill, which was available to the entire legislature before enactment of

---

[45] *See* notes 41, 42, *supra*.

[46] Wis. Stat. § 13.92(1)(b)2.

[47] Legislative Reference Bureau Analysis of 1995 Assembly Bill 36.

the law, is a much more compelling indicator of what the legislation meant than private communications with a legislator speculating about what existing legislation "arguably" or "presumably" meant in light of a case interpreting a totally different statute.

¶ 168. Additionally, a case cited and quoted in both memoranda that the majority submits in support of its theory holds to the contrary. In *York v. National Continental Ins. Co.*, the plaintiffs contended that each parent was entitled to recover damages for loss of society and companionship up to the statutory limit. The court rejected this argument and held that under the wrongful death statute, recovery was limited by statute and the statutory sum was to be divided among members of the statutorily defined class of claimants:

> We hold that the sec. 895.04(4), Stats., limit of $50,000 for loss of society and companionship in a wrongful death action is recoverable by the spouse of the person deceased, or if no spouse is living by the class of children of the person deceased as defined in sec. 895.04(2), or if no children are living by the *class of parents of the person deceased* (emphasis added).[48]

¶ 169. Moreover, the cases this court has heard involving Wis. Stat. § 893.55(4)(f) and the increased limits for wrongful death in medical malpractice cases demonstrate that those who were most involved with the issues understood that the $150,000 cap applied to both parents in aggregate in medical malpractice wrongful death cases.

---

[48] *York v. Nat'l Cont'l Ins. Co.*, 158 Wis. 2d 486, 499, 463 N.W.2d 364 (Ct.App. 1990).

¶ 170. For example, in *Schultz v. Natwick,*[49] the parties treated the limit for wrongful death claims under Wis. Stat. § 893.55(4)(f) as encompassing the claims for loss of society and companionship of both surviving parents, both before and after the "per occurrence" language was added.[50] See also *Neiman v. American National Property and Casualty Company,*[51] in which the parties litigated their case with the understanding that the caps for wrongful death applied to the parents in aggregate, not separately.[52]

¶ 171. The Schultzes' understanding of the application of the cap is important because Barbara Schultz was one of the key advocates for the increased caps in wrongful death in medical malpractice cases. The Schultzes' only noneconomic claim was for their loss of society and companionship of their young child who tragically died as a result of medical malpractice. Ms. Schultz's comments about wrongful death and medical malpractice, quoted by the majority, have to be read in this context. Ignoring the context of the Schultzes' claims, the majority opinion distorts Ms. Schultz's comments to support its reading of the statute. The majority now mocks the Schultzes' efforts by interpreting their law to reduce awards for the death of victims of medical malpractice.

---

[49] *Schultz v. Natwick,* 2002 WI 125, 257 Wis. 2d 19, 653 N.W.2d 266.

[50] *See* Brief for Respondent at App. 141; *Schultz v. Natwick,* 2002 WI 125, 257 Wis. 2d 19, 653 N.W.2d 266. *See also* Brief for Appellant at 7.

[51] *Neiman v. Am. Nat'l Prop. & Cas. Co.,* 2000 WI 83, 236 Wis. 2d 411, 613 N.W.2d 160.

[52] *See* Brief for Appellant at 6, *Neiman v. Am. Nat'l Prop. & Cas. Co.,* 2000 WI 83, 236 Wis. 2d 411, 613 N.W.2d 160. *See also* Brief for Respondent at 17.

¶ 172. Forgetting the victims of malpractice, the majority errs in its interpretation because its total and sole concern is for health care providers and the cost of insurance premiums. The majority cynically attributes this attitude to the legislature and the strength of the health care providers' lobby.

¶ 173. The majority's interpretation ignores the legislature's and governor's concern for the welfare of the people evident in the Justin Sky Millar—Lindsey Brooke Schultz law increasing damages for loss of society and companionship in wrongful death actions to $350,000 and $500,000. Governor Thompson expressed this concern for the victims and their families as follows when he signed the law:

> The legislation I am signing today is named the "Justin-Lindsey Bill" for two families who tragically lost children and fought courageously to raise the limits on compensation. Lindsey Brooke Schultz died at age 13 during a routine appendectomy when a hole was punctured in her abdominal aorta. Justin Sky Millar died at age 11 from an allergy shot. These are two tragedies. Today we make sure that families like Lindsey's and Justin's have the opportunity to pursue fair compensation for their losses. So it is in memory of Justin and Lindsey that I sign this legislation into law.[53]

¶ 174. The majority opinion has lost sight of the welfare of the victims in its interpretation. Too bad for the people of the state! The legislature can correct the majority's misinterpretation of a law. The families of the state will have to make their voices heard again.

---

[53] Governor Thompson's Press Release, Resp. Supp. App. 330.

## II

¶ 175. We would answer the three questions posed by the majority opinion as follows:

(1) The plaintiffs in an action in which death is caused by medical malpractice may recover the limits of noneconomic damages for both medical negligence and wrongful death.

(2) The wrongful death limit is unconstitutional under the majority's interpretation of the statutes.

(3) The circuit court erroneously exercised its discretion in ordering remittitur of the verdict in favor of the estate for pre-death pain and suffering, reducing the award from $550,000 to $100,000.

¶ 176. We set forth our reasoning in full even though the discussion may to some extent overlap or repeat arguments made earlier in our criticism of the majority opinion. We do so in order to illustrate the logical simplicity with which our interpretation applies to the facts of this case, and so that the reader may contrast this approach with the convoluted way in which the majority stretches, and reaches beyond, the bounds of accepted legal principles in order to reach its desired result.

### (1)

¶ 177. We determine that the limits on noneconomic damages set forth in Wis. Stat. §§ 893.55(4)(d) and (4)(f) serve as two separate and distinct recoveries when medical malpractice causes wrongful death.

¶ 178. The issue presented is one of statutory interpretation, a question of law that this court determines independently of the circuit court and court of appeals, benefiting from the analysis of those courts.

104

¶ 179. We begin our journey through the statutes with chapter 655. Wisconsin Stat. § 655.017 states that in medical malpractice actions, "the amount of non-economic damages recoverable by a claimant or plaintiff . . . for acts or omissions of a health care provider . . . is subject to the limits under §§ 893.55(4)(d) *and* (f)" (emphasis added).

¶ 180. Section 655.017 provides as follows:

*The amount of noneconomic damages recoverable* by a claimant or plaintiff under this chapter for acts or omissions of a health care provider if the act or omission occurs on or after May 25, 1995, and for acts or omissions of an employe of a health care provider, acting within the scope of his or her employment and providing health care services, for acts or omissions occurring on or after May 25, 1995, *is subject to the limits under s. 893.55(4)(d) and (f)* (emphasis added).

¶ 181. The text of § 655.017 does not limit recovery to the lesser of either the § 893.55(4)(d) limit for medical malpractice or the § 893.55(4)(f) limit for wrongful death. Rather, § 655.017 directs us to both §§ 893.55(4)(d) *and* (f) to assess the limits on damages imposed in cases of medical malpractice causing wrongful death.

¶ 182. Section 655.017 recognizes that both the limit on noneconomic damages under Wis. Stat. § 893.55(4)(d) and the limit on wrongful death damages under Wis. Stat. § 893.55(4)(f) are applicable in medical malpractice actions. Had the legislature intended to limit recovery to either the § 893.55(4)(d) limit or the § 893.55(4)(f) limit depending on whether the patient died, it would have used different language.

¶ 183. Wisconsin Stat. § 893.55(4)(d) sets the limit on noneconomic damages in medical malpractice

actions for each occurrence at $350,000 (adjusted for inflation). Section 893.55(4)(d) states in full as follows:

> The limit on total noneconomic damages for each occurrence under par. (b) on or after May 25, 1995, shall be $350,000 and shall be adjusted by the director of state courts to reflect changes in the consumer price index for all urban consumers, U.S. city average, as determined by the U.S. department of labor, at least annually thereafter, with the adjusted limit to apply to awards subsequent to such adjustments.

¶ 184. Wisconsin Stat. § 893.55(4)(f) states that "notwithstanding the limits on noneconomic damages" under § 893.55(4) (namely $350,000), "damages recoverable against health care providers . . . for wrongful death are subject to the limit under § 895.04(4)." Wisconsin Stat. § 893.55(4)(f), which we set forth again, provides as follows:

> Notwithstanding the limits on noneconomic damages under this subsection, damages recoverable against health care providers and an employe of a health care provider, acting within the scope of his or her employment and providing health care services, for wrongful death are subject to the limit under s. 895.04(4). If damages in excess of the limit under s. 895.04(4) are found, the court shall make any reduction required under s. 895.045 and shall award the lesser of the reduced amount or the limit under s. 895.04(4).

¶ 185. Because Wis. Stat. § 893.55(4)(f) refers to § 895.04(4), which governs the limit on damages for loss of society and companionship in wrongful death actions regardless of whether these damages arise in medical malpractice cases or other torts, we turn to § 895.04(4). Section 895.04(4) governs limits on loss of society and companionship damages in wrongful death actions both in medical malpractice and in other torts. The limit on

106

damages for loss of society and companionship set by § 895.05(4), the wrongful death statute, was $150,000 in this case. Section 895.04(4) provides as follows:

> Judgment for damages for pecuniary injury from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional damages not to exceed $150,000 for loss of society and companionship may be awarded to the spouse, children or parents of the deceased.

¶ 186. In support of his argument that the statutes create a "global cap" of $350,000, Dr. Hall directs us to Wis. Stat. § 893.55(4)(b).[54] Wisconsin Stat. § 893.55(4)(b) states that the "total noneconomic damages recoverable for bodily injury or death" arising from medical malpractice "may not exceed" $350,000. Dr. Hall argues that the legislature's use of the word "death" demonstrates its intent to include wrongful death claims within the "total noneconomic damages recoverable" under the medical malpractice damage cap.

¶ 187. Interpreting Wis. Stat. § 893.55(4)(b) to include wrongful death as part of "total noneconomic damages" would, however, render paragraph (f) superfluous. Paragraph (f) states that "[n]otwithstanding the limits on noneconomic damages" under § 893.55(4) ($350,000), "damages recoverable against health care

---

[54] For the reader's convenience we again quote Wisconsin Stat. § 893.55(4)(b):

> The total noneconomic damages recoverable for bodily injury or death, including any action or proceeding based on contribution or indemnification, may not exceed the limit under par. (d) for each occurrence on or after May 25, 1995, from all health care providers and all employes of health care providers acting within the scope of their employment and providing health care services who are found negligent and from the patients compensation fund.

providers . . . for wrongful death are subject to the limit under § 895.04(4)" (emphasis added). On its face, the "notwithstanding" phrase points us away from Wis. Stat. § 893.55(4) (the $350,000 cap on noneconomic damages in medical malpractice) and toward § 895.04(4) (establishing the $150,000 cap on loss of society and companionship in wrongful death actions) to determine the recovery limits available in a wrongful death action.

¶ 188. Dr. Hall attempts to sidestep this inconvenient "notwithstanding" phrase by arguing that paragraph (f) means that recovery for wrongful death is limited to the amount set forth in Wis. Stat. § 895.04(4) ($150,000) even if the "total noneconomic damages" are further limited by § 893.55(4)(d) ($350,000).

¶ 189. We agree with the parents that the text of Wis. Stat. § 893.55(4)(f) means that wrongful death actions are separated from the various provisions of Wis. Stat. § 893.55(4) (medical malpractice) and that notwithstanding any other limits on damages contained in the medical malpractice statute, the statute on wrongful death retains its integrity even in a case involving medical malpractice. The legislature's phrasing "notwithstanding the limits on noneconomic damages" under § 893.55(4) ($350,000) specifically directs us to the cap in the wrongful death statute in evaluating the award for noneconomic damages (that is, the loss of society and companionship) in a wrongful death action. To read the statute otherwise would render the language "notwithstanding" superfluous, something we cannot do if we are to be true to the legislative text.

¶ 190. Our reading of the statute is consistent with the history of Wis. Stat. §§ 655.017 and 893.55(4). Upon original passage, chapter 655 did not include a cap on noneconomic damages in medical malpractice

cases. Nor did chapter 655 refer to wrongful death damages. It was not until 1986 that the legislature created a cap on noneconomic damages in medical malpractice actions; the cap was $1,000,000. Section 655.017 was amended to read that "the amount of noneconomic damages recoverable by a claimant under this chapter [governing medical malpractice]. . . is subject to the limit" (singular) under section 893.55(4).[55] Chapter 655 contained no explicit reference to a separate cap for wrongful death actions.

¶ 191. Because chapter 655 did not expressly state that damages recoverable in medical malpractice actions (the loss of society and companionship) were subject to the limitation under the general wrongful death provisions of Wis. Stat. § 895.04(4), this court held in *Rineck v. Johnson* that the wrongful death limit on noneconomic damages was superseded by the higher noneconomic damage cap in medical malpractice cases.[56] According to the *Rineck* court, § 893.55(4)(b), the cap governing medical malpractice, not § 895.04, applied to wrongful death claims caused by medical malpractice.

¶ 192. One year after our decision in *Rineck,* the provisions of Wis. Stat. § 655.017 and its companion § 893.55(4) were sunset. Therefore, from 1991 to 1995 no cap existed at all on noneconomic damages in medical malpractice cases. In *Jelinek v. St. Paul Fire and Casualty Ins. Co.,*[57] the court held that after January 1, 1991, noneconomic damages for medical malpractice actions involving death were not limited.

---

[55] 1985 Wis. Act 340, § 30; Wis. Stat. § 655.017 (1987–88).

[56] *Rineck,* 155 Wis. 2d at 665–68.

[57] *Jelinek v. St. Paul Fire & Cas. Ins. Co.,* 182 Wis. 2d 1, 9, 512 N.W.2d 764 (1994).

¶ 193. Possibly as a response to our decisions in these cases, in 1995 the legislature amended the statutes and chapter 655 to create Wis. Stat. § 893.55(4)(f).[58] Section 893.55(4)(f) originated in 1995 Assembly Bill 36[59] and in effect undoes *Rineck* by making the wrongful death limitation in § 895.04(4) applicable to medical malpractice actions.[60] The Legislative Reference Bureau's analysis of the bill quoted in part earlier[61] demonstrates that the bill creates two separate statutory limits, one on noneconomic damages in medical malpractice cases and one on damages for wrongful death (loss of society and companionship) arising from medical malpractice.[62]

¶ 194. Finally, imposing Dr. Hall's "global cap" leads to absurd consequences. Under the present statute, the wrongful death cap for minor children ($500,000) is higher than the "total noneconomic damages cap" for medical malpractice ($350,000 adjusted for inflation). Interpreting the statute as Dr. Hall asserts means the bigger cap is forced to fit within a smaller cap. Also, the new $500,000 cap on wrongful death claims would not be realized in a medical malpractice

---

[58] *See Czapinski,* 236 Wis. 2d 316, ¶ 16.

[59] 1995 Wis. Act 10.

[60] *See Czapinski,* 236 Wis. 2d 316, ¶ 16.

[61] *See* ¶ 144, *supra.*

[62] While we must be wary of relying too heavily on rejected amendments as evidence of legislative intent, there is historical evidence that the creation of a "global cap" of $500,000 for all noneconomic damages regardless of death was considered by the legislature and rejected. *See* amendment to Wis. Stat. § 895.04(4)(f) submitted by Senator Joanne Huelsman in 1997 providing a "cap within a cap." *See* Senate Substitute Amendment 2 to 1997 Senate Bill 148.

claim because the new cap exceeds the limit for noneconomic damages in medical malpractice.

¶ 195. Dr. Hall argues that since the $350,000 limit under Wis. Stat. § 893.55(4) is adjusted for inflation and therefore eventually will be greater than the $500,000 limit under § 895.04(4), his interpretation is valid. We disagree. Nothing in text of the new $500,000 wrongful death cap or its history gives any indication that the new cap would have to await the inflation index.

¶ 196. For the reasons set forth we conclude that the limits on noneconomic damages set forth in Wis. Stat. §§ 893.55(4)(d) and (4)(f) relating to medical malpractice and wrongful death serve as two separate and distinct recoveries when medical malpractice causes wrongful death.

(2)

¶ 197. The jury in this case awarded $2,500,000 to Shay's parents as wrongful death damages for their loss of society and companionship. In addition, the jury awarded $550,000 to Shay's estate for her pre-death pain and suffering. The majority would reduce the wrongful death damages from $2,500,000 to $300,000 as the total amount of noneconomic damages that is recoverable by her parents.[63] Because the majority concludes that $300,000 is the most that may be recovered, it declines to address the remittitur of the $550,000 award of the jury to the estate for pain and suffering. Given the link between Article I, Section 5[64] and Article I, Section 9 in the Wisconsin Constitution,

---

[63] Majority op., ¶ 114.

[64] Article I, Section 5 of the Wisconsin Constitution states, in relevant part, as follows:

111

the majority reaches an untenable conclusion. Such a low cap on noneconomic damages effectively denies plaintiffs the constitutional right to trial by jury under Article I, Section 5 and, in turn, to a remedy as guaranteed by Article I, Section 9 of the Wisconsin Constitution.[65] Moreover, the majority's conclusion is violative of equal protection principles embodied in the Wisconsin and United States Constitutions.[66]

> The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law. Provided, however, that the legislature may, from time to time, by statute provide that a valid verdict, in civil cases, may be based on the votes of a specified number of the jury, not less than five-sixths thereof.

[65] We conclude that the global cap on damages manufactured by the majority is unconstitutional on the basis of Article I, Section 5 and Article I, Section 9 interpreted together, as well as on equal protection grounds. Since we rest our conclusion of unconstitutionality on those grounds, there is no need to discuss the separation of powers and substantive due process issues.

[66] Amendment XIV, Section 1 of the United States Constitution states, in relevant part, as follows: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article I, Section 1 of the Wisconsin Constitution states, in relevant part, as follows: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

"This court applies the same interpretation to the state Equal Protection Clause as that given to the equivalent federal provision. *Compare* Wis. Const. Art. I, § 1 *with* U.S. Const.

112

¶ 198. We turn first to decisions from other states that have addressed caps on noneconomic damages in relation to constitutional provisions protecting the rights to trial by jury and to a remedy for injuries or wrongs. In *Smith v. Department of Insurance*,[67] the Florida Supreme Court concluded that a $500,000 cap on noneconomic damages in medical malpractice cases violated Florida's Constitution. Article I, § 21 of the Florida Constitution stated the following: "The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."[68] In a previous case, *Kluger v. White*,[69] involving the setting of a floor for noneconomic damages in which a plaintiff would not be entitled to sue if the plaintiff's damages were below a specified amount, the Florida Supreme Court noted the unconstitutionality of such a provision, since it would hinder a party's access to the courts. Noting that its holding in *Kluger* was directly controlling in *Smith,* the court stated:

> [W]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity

Amend. XIV, § 1." *Castellani v. Bailey,* 218 Wis. 2d 245, 261, 578 N.W.2d 166 (1998) (citations omitted).

[67] *Smith v. Dep't of Ins.*, 507 So. 2d 1080, 1083 (Fla. 1987).

[68] *Smith,* 507 So. 2d 1082, 1087 (quoting Florida Const. Art. I, § 21).

[69] *Kluger v. White,* 281 So. 2d 1 (Fla. 1973).

for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.[70]

¶ 199. The court in *Smith* rejected the appellees' arguments that medical malpractice plaintiffs were not denied access to the courts, since the legislature had merely capped damages and not completely abolished a cause of action.[71] In rejecting this argument, the court recognized the link between constitutional provisions concerning trial by jury and right to a remedy through access to courts, when the court stated the following:

> This reasoning focuses on the title to article I, section 21, "Access to courts," and overlooks the contents which must be read in conjunction with section 22, "Trial by jury." Access to courts is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for, e.g., $1,000,000, has not received a constitutional redress of injuries if the legislature statutorily, and arbitrarily, caps the recovery at $450,000. Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have heretofore understood that right. Further, if the legislature may constitutionally cap recovery at $450,000, there is no discernible reason why it could not cap the recovery at some other figure, perhaps $50,000, or $1,000, or even $1.[72]

¶ 200. The *Smith* court further noted that the court would reach the issue of whether there was a

[70] *Smith,* 507 So. 2d at 1088 (quoting *Kluger,* 281 So. 2d at 4 (Fla. 1973)).

[71] *Id.*

[72] *Id.* at 1088–89. *See also Mattos v. Thompson,* 491 Pa. 385, 421 A.2d 190 (Pa. 1980) (recognizing that a restrictive statutory provision in the Health Care Services Malpractice Act impermissibly infringes on the constitutional right to trial by jury).

rational basis for the cap only when "the legislature provides an alternative remedy or abrogates or restricts the right based on a showing of overpowering public necessity and that no alternative method of meeting that necessity exists."[73] The court noted that the legislature had failed to provide alternate remedies, and the appellees failed to argue that the damages cap was based on public necessity and another such remedy was unavailable.[74]

¶ 201. In *Lucas v. United States*,[75] the court concluded that a statutory damages cap unconstitutionally limited a litigant's "right of access to the courts for a 'remedy by due course of law.' "[76] First, the court noted that the legislature failed to provide Lucas with any alternative means by which he could seek redress.[77] The court acknowledged the legislature's concern with liability insurance rates and its desire to see a decrease in those rates.[78] Nevertheless, the court stated that "Texas Constitution article I, section 13, guarantees meaningful access to the courts whether or not liability rates are high."[79] Drawing from the reasoning set forth in *Smith, Lucas* rejected the defendant's argument that the applicable statutory cap did not abolish a cause of action and, therefore, the plaintiff was not denied access to the courts.[80] The court in *Lucas* cited with approval the language in *Smith* that stated that a

---

[73] *Smith,* 507 So. 2d at 1089.

[74] *Id.*

[75] *Lucas v. United States,* 757 S.W.2d 687, 690 (Tex. 1988).

[76] Id. (citation omitted).

[77] *Id.* at 690.

[78] *Id.* at 691.

[79] *Id.*

[80] *Id.* at 691–92.

plaintiff is denied the constitutional right to a jury trial when a jury verdict is arbitrarily capped.[81] Citing with approval reasoning from the Supreme Court of New Hampshire, the court stated the following: " 'It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation.' "[82]

¶ 202. The issue of lowering a statutory cap on damages so drastically that it could be deemed unreasonable and result in a denial of the constitutional right to trial by jury and denial of the right to a remedy, has also been raised and decided in Maine. In *Peters v. Saft*,[83] the Supreme Judicial Court of Maine noted that "it is conceivable that a statute could limit the measure of tort damages so drastically that it would result in a denial of the right to trial by jury and the denial of a remedy . . . ."[84]

¶ 203. In Wisconsin, we have long recognized the importance of a litigant's right to a remedy.

> A suitor, therefore, may properly insist upon a complete remedy and is clearly within his constitutional rights in refusing, for any reason, to waive any part of his just demand or defense. That in obtaining such relief the amount involved is far less than the cost to the state or community in awarding it to him is not and should not

---

[81] *Id.* at 692.

[82] *Id.* (quoting *Carson v. Maurer*, 424 A.2d 825, 837 (N.H. 1980)).

[83] *Peters v. Saft*, 597 A.2d 50, 53 (Me. 1991).

[84] *See also State ex rel. Cardinal Glennon Mem'l Hosp. for Children v. Gaertner*, 583 S.W.2d 107 (Mo. 1979) (recognizing that restrictive statutory provisions in regard to medical malpractice claims were unconstitutional as a violation of the constitutional right to open courts and a certain remedy).

be permitted to influence trial courts and juries in considering the merits of the issue.[85]

¶ 204. Moreover, we have discussed this right to a remedy in reference to Article I, Section 9 of the Wisconsin Constitution.

> If we recur to our own organic state law we find the fundamental provision that "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain justice freely and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws." Sec. 9, art. I, Const. This is a basic and valuable guaranty that the courts of the state should be open to all persons who in good faith and upon probable cause believe they have suffered wrongs. Is it not against public policy to permit one person to deprive another from asserting his rights in court?[86]

¶ 205. In *Stanhope v. Brown County*,[87] this court discussed Article I, Section 9 in relation to statutory damages caps. The court noted that Article I, Section 9 provides that

> [e]very person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it,

---

[85] *Knickerbocker v. Beaudette Garage Co.*, 190 Wis. 474, 480–81, 209 N.W.2d 763 (1926).

[86] *In re Keenan's Will*, 188 Wis. 163, 176, 205 N.W.2d 1001 (1925).

[87] *Stanhope v. Brown County*, 90 Wis. 2d 823, 280 N.W.2d 711 (1979).

completely and without denial, promptly and without delay, conformably to the laws.[88]

¶ 206. In *Stanhope,* we further noted our decision in *McCoy v. Kenosha County,*[89] where we stated that "the phrase 'injuries and wrongs' in the 'certain remedy' clause were [sic] to be understood with reference to those injuries and wrongs for which remedies were available at common law when the constitution was adopted in 1848."[90] In *McCoy,* we noted that "[t]his court has recently and frequently asserted the importance and value to the individual of this very provision, sec. 9, art. I, Const., and that it is not to be slighted or minimized . . . ."[91]

---

[88] *Stanhope,* 90 Wis. 2d at 844 (quoting Wis. Const. Art. I, § 9).

[89] *McCoy v. Kenosha County,* 195 Wis. 273, 218 N.W. 348, 57 A.L.R. 412 (1928).

[90] *Stanhope,* 90 Wis. 2d at 845 (citing *McCoy,* 195 Wis. 273). In *Stanhope,* we examined the statutory limit to determine whether it represented an unreasonably low recovery amount such that it rendered the statute invalid. *Stanhope,* 90 Wis. 2d at 844. *See also Sambs v. City of Brookfield,* 97 Wis. 2d 356, 367, 293 N.W.2d 504 (1980).

[91] *McCoy,* 195 Wis. at 283 (1928) (citation omitted). *See also* Thomas R. Phillips, *The Constitutional Right to a Remedy,* 78 N.Y.U. L. Rev. 1309, 1312 (2003) (Phillips, the Chief Justice of the Supreme Court of Texas, recognized that "[i]n the medical malpractice area, courts have struck down statutes capping noneconomic damages for medical malpractice victims and requiring medical malpractice claims to be screened by experts before filing" (footnote omitted).).

¶ 207. Though the decision was later reversed, in *Estate of Makos v. Masons Health Care Fund,*[92] the lead opinion concluded that a statute of repose violated the plaintiffs constitutional right to a remedy under Article I, Section 9 of the Wisconsin Constitution, since it closed the courtroom doors before the plaintiff even discovered that she was injured. In a concurrence written by Justice Crooks, the history behind and the implications of Article I, Section 9 were rather fully explored.[93] While Article I, Section 9 does not confer any rights itself, it does guarantee a remedy when an injury results from an infringement of a legal right.[94] Under the common law, apparently existing prior to adoption of the Wisconsin Constitution, individuals in Wisconsin had a right to bring medical malpractice actions.[95] With the establishment of ch. 655 in 1975, this right became legislatively recognized.[96] The concurrence ultimately concluded

> that courts should consider the following three principles, along with the nature of the cause of action, in determining whether an individual has been denied the right to a remedy in violation of art. I, § 9 through the legislature's modification, reduction, or elimination of a right to bring a cause of action: (1) whether the legislature modified, reduced, or eliminated a post-constitutional cause of action created by the legislature itself; (2) whether the legislature modified, reduced, or eliminated a common law or pre-constitutional statutory cause of action and provided a reasonable alterna-

---

[92] *Estate of Makos v. Masons Health Care Fund,* 211 Wis. 2d 41, 54, 564 N.W.2d 662 (1997).

[93] *Makos,* 211 Wis. 2d at 60–67 (Crooks, J., concurring).

[94] *Id.* at 62 (Crooks, J., concurring).

[95] *Id.* at 63 (Crooks, J., concurring).

[96] *Id.*

tive; and (3) whether, if the legislature did not provide a reasonable alternative, it has established that an overpowering public necessity for the abolishment of such right exists, and that no reasonable alternative exists.[97]

¶ 208. While Article I, Section 9 on its own would not result in a conclusion of unconstitutionality here, when linked with the right to trial by jury, however, we conclude that the majority's interpretation of the medical malpractice statutes is unconstitutional.[98] More specifically, it is unreasonable and unconstitutional to manufacture, out of whole cloth, a global cap covering the parent's damages for wrongful death and the estate's damages for pain and suffering.[99] Such a cap offends the parent's right to trial by jury under Article

---

[97] *Id.* at 67 (Crooks, J., concurring).

[98] The majority opinion states that "Article I, § 9, singly or in combination with Article I, § 5, does not bar the legislature from making rationally-based determinations about causes of action related to health care in Wisconsin." Majority op., ¶ 99 n.20. However, the majority's interpretation of the applicable statutes is not, in our opinion, rationally based. The majority conflates the wrongful death and survivorship claims, and, in doing so, arrives at an unreasonable and unconstitutional global cap on damages.

[99] In *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 311–15, 294 N.W.2d 437 (1980), we explained that cause of action for wrongful death differed from a survival action for pain and suffering. We stated:

> The cause of action for the child's pain and suffering which, as we discussed earlier, passes to a decedent's estate, is separate and distinct from this wrongful death action. The estate's action is for the wrong to the injured person; the wrongful death action belongs to named beneficiaries for their pecuniary loss; the latter action begins where the former ends. "It is not a double recovery, but a recovery for a double wrong."

I, Section 5 as linked to the right to a remedy under Article I, Section 9. We emphasize that we are not taking issue with the constitutionality of statutory damages caps in general. Rather, we conclude that the majority's interpretation of the statutes as requiring such a reduced global cap on noneconomic damages is unconstitutional.

¶ 209. The majority's action in conflating wrongful death and survivorship actions and in interpreting the statutes as imposing a global cap (here $300,000 for both actions) paints the legislature as a body that has reduced common law and pre-constitutional causes of action, which are now statutory, without providing a reasonable alternative. We do not believe that this is what the Wisconsin Legislature did, but rather it is what the majority now does by its interpretation of the statutes involved. Certainly, the plaintiffs in this case will be adversely affected by the majority's arbitrary decision. Moreover, it is indisputable that this decision will have a negative impact well beyond the parties in this case. As Barbara Schultz, an aggrieved parent, told legislators and the public: "With the $150,000 cap, it is making it very hard for cases to even get to court. Why? Medical malpractice cases are very expensive. Attorneys sometimes turn down cases. The reason is, the expert testimonies, which are usually from Doctors, also must be paid."[100]

---

*Id.* at 312 (citations omitted).

[100] *See* majority op., ¶ 80 n.8. *See also Five Dangerous Myths About California's Medical Malpractice Restrictions, available at* http://www.consumerwatchdog.org/healthcare/fs/fs 003009.php3 and *Hype Outraces Facts in Malpractice Debate* (March 5, 2003), *available at* http://www.usatoday.com/money/ industries/health/2003–03–04–malpractice-cover_x.htm, for discussions regarding the refusal of California lawyers to

¶ 210. Finally, we again turn for guidance to decisions from other states, and we conclude that the majority's interpretation is violative of equal protection principles. In *Arneson v. Olson*,[101] the North Dakota Supreme Court concluded that a statute capping medical malpractice damages violated the equal protection rights of injured victims of medical malpractice negligence in violation of the North Dakota Constitution. The court in *Arneson* stated the following:

handle medical malpractice cases given the $250,000 noneconomic damages cap that, in effect, has resulted in a denial of a remedy to many potential medical malpractice plaintiffs. Robert C. Baker, then president of the American Board of Trial Advocates (ABOTA), testified before the House Judiciary Committee in 1994 and stated the following:

> As a result of the caps on damages, most of the exceedingly competent plaintiff's lawyers in California simply will not handle a malpractice case.

> There are entire categories of cases that have been eliminated since malpractice reform was implemented in California. The victims of cases that have a value between $50,000 and $150,000 are basically without representation. As an example, incidents of failure to diagnose appendicitis still occur, but suits are not filed to any extent in California.

Five Dangerous Myths About California's Medical Malpractice Restrictions, available at http://www.consumerwatchdog.org/healthcare/fs/fs003009.php3.

It is worth noting that ABOTA's membership roster is comprised of half plaintiffs' attorneys and half defense attorneys. Baker's major clients, the HMO Kaiser Permanente and the malpractice insurer The Doctor's Company, fired him soon after he testified.

[101] *Arneson v. Olson*, 270 N.W.2d 125, 135 (N.D. 1978).

At the beginning of this opinion we quoted the pre-amble of the statute, containing its legislative purposes. These include assurance of availability of competent medical and hospital services at reasonable cost, elimination of the expense involved in nonmeritorious malpractice claims, provision of adequate compensation to patients with meritorious claims, and the encouragement of physicians to enter into practice in North Dakota and remain in such practice so long as they are qualified to do so.

Does the limitation of recovery of seriously damaged or injured victims of medical negligence promote these aims? We hold that it does not and that it violates the Equal Protection Clause of the State Constitution. Certainly the limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does nothing toward the elimination of nonmeritorious claims. Restrictions on recovery may encourage physicians to enter into practice and remain in practice, but do so only at the expense of claimants with meritorious claims.[102]

¶ 211. Similarly, the majority's interpretation in this case fails to provide adequate compensation for the claimants here and does nothing to deter the filing of nonmeritorious claims. The majority's interpretation of the medical malpractice statutes seeks to "impose the burden of supporting the medical care industry solely upon those persons who are most severely injured, and therefore most in need of compensation" by effectively writing pain and suffering out of the equation when a patient dies.[103] In *Carson v. Maurer,* 424 A.2d 825, 837 (N.H. 1980), the New Hampshire Supreme Court con-

---

[102] *Id.* at 135–36.

[103] *Carson v. Maurer,* 424 A.2d 825, 837 (N.H. 1980) (citation omitted).

123

cluded that a $250,000 limit on noneconomic damages denied the plaintiffs in medical malpractice cases equal protection under the New Hampshire Constitution.[104] The court in *Carson* rejected the defendants' arguments that the cap on noneconomic damages was constitutional because the defendants were not limited in the amount recoverable for economic loss. The court aptly noted that an award for economic loss does not provide the same remedy as that provided by a recovery for noneconomic damages.[105] The court stated:

> It is clear, however, that a tort victim "gains" nothing from the jury's award for economic loss, since that money replaces that which he has actually lost. It is only the award above the out-of-pocket loss that is available to compensate in some way for the pain, suffering, physical impairment or disfigurement that the victim must endure until death.[106]

¶ 212. Wisconsin courts interpret the Wisconsin and United States constitutional provisions governing equal protection identically.[107] Parties bringing an equal protection claim must prove that a statute treats similarly situated members of a class differently.[108] Since a fundamental right is not involved in a medical malpractice claim, we conclude that a rational basis standard is applicable in this case.[109] In general, we "uphold a statute under equal protection principles if

[104] *Id.* at 838.

[105] *Id.* at 837.

[106] *Id.*

[107] *Aicher v. Wis. Patients Comp. Fund,* 2000 WI 98, ¶ 55 n.14, 237 Wis. 2d 99, 613 N.W.2d 849 (citation omitted).

[108] *Id.,* ¶ 56.

[109] *Guzman v. St. Francis Hosp., Inc.,* 2001 WI App 21, ¶ 20, 240 Wis. 2d 559, 623 N.W.2d 776.

we find that a rational basis supports the legislative classification."[110] We must "determine whether a classification scheme rationally advances a legislative objective. In so doing, we are obligated to locate or, in the alternative, construct a rationale that might have influenced the legislative determination."[111]

¶ 213. Here, the majority adopts a rationale that fails to advance the Legislature's objective and unfairly assigns the burden of maintaining the financial well-being of the medical care industry to injured plaintiffs.

¶ 214. We conclude that the majority's new formula for configuring noneconomic damages in medical malpractice cases is violative of the equal protection clause in the Wisconsin Constitution, since it unduly burdens medical malpractice claimants without a rational basis that justifies its interpretation of the medical malpractice statutes.

¶ 215. In sum, the majority's tortured interpretation of the statutes, which results in the concoction of a global cap applicable to both wrongful death and survivorship actions, does violence to the plaintiffs' rights to a jury trial in conjunction with their right to a remedy, and, further, is violative of their right to equal protection.

(3)

¶ 216. We turn now to the issue of remittitur. The majority does not discuss whether the circuit court erroneously exercised its discretion in ordering remittitur of the jury's award of pre-death pain and suffering. It concludes that such a discussion is unnecessary

---

[110] *Aicher*, 237 Wis. 2d 99, ¶ 56 (citations omitted).
[111] *Id.*, ¶ 57.

because the verdict for pain and suffering has no effect on the recovery in the present case. The majority assumes that the parents share equally in the child's estate, but because each parent can recover only $150,000, the damages for the child's pain and suffering are irrelevant. As we stated previously, the majority opinion leaves open the question of how to allocate damages when different claimants are entitled to damages for survival actions and to damages for wrongful death.

¶ 217. We decide the remittitur issue to complete discussion and give full consideration to the parties' arguments. The jury awarded damages to the Estate for Shay's pain and suffering prior to her death in the amount of $550,000. The circuit court granted remittitur, reducing the award to $100,000.

¶ 218. Before we can decide this issue, we must first decide whether the parents have standing to raise the issue of remittitur on cross-appeal. Whether a person has standing is a question of law that this court determines independently of the circuit court, benefiting from the analysis of the circuit court.

¶ 219. Dr. Hall contends that the parents are precluded from raising the remittitur issue because they accepted the order of remittitur instead of seeking a new trial. In support of his argument, Dr. Hall cites *Burmek v. Miller Brewing Co.*, in which the court held that when a plaintiff is given an option to accept a reduced amount of damages or a new trial limited to damages, acceptance of the reduced damages precludes appellate review of the circuit court's determination of the damage issue.[112]

---

[112] *Burmek v. Miller Brewing Co.*, 12 Wis. 2d 405, 107 N.W.2d 583 (1961).

¶ 220. The parents counter that subsequently, in *Plesko v. City of Milwaukee,* the court modified the *Burmek* rule.[113] *Plesko* states that "the rule in the *Burmek* case should be limited to the situation where the party awarded damages appeals" and that when an opposing party appeals, the party who has accepted the option to take judgment for such a reduced amount of damages may nevertheless have a review on appeal of the circuit court's determination of the damage issue.[114]

¶ 221. Because Dr. Hall initiated the appeal, the rationale undergirding the *Burmek* rule is not present in this case. The *Plesko* court explained its reasoning behind the modification of *Burmek* as follows:

> The objective underlying the recommended procedure for granting an option to accept judgment for a reduced amount of damages in lieu of having a new trial, where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages,

---

[113] *Plesko v. City of Milwaukee,* 19 Wis. 2d 210, 120 N.W.2d 130 (1963).

[114] *Plesko,* 19 Wis. 2d at 221.

especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal.[115]

¶ 222. We conclude that the parents have standing to raise the remittitur issue on cross-appeal. An appeal on any grounds constitutes the kind of "new proceeding" that *Burmek* was meant to discourage. The cross-appeal on the damages issue does not cause any more delay or expense than Dr. Hall's appeal already has. It is the identity of the party raising the appeal that is determinative under *Plesko*.[116]

¶ 223. Having reached the conclusion that the parents have standing, we further conclude that the circuit court erroneously exercised its discretion in ordering remittitur of the jury's pre-death pain and suffering award.

¶ 224. The standard applicable for review of a circuit court's reduction of damages is well-settled. When a circuit court "states its reasons for finding the jury's award of damages excessive and for reducing the award," the reviewing court will reverse the circuit court's determination only if "the reviewing court concludes there has been an erroneous exercise of discre-

---

[115] *Id.*

[116] For other cases confirming the right to cross appeal an order of remittitur, see, *e.g., Bash v. Employers Mut. Liab. Ins. Co.,* 38 Wis. 2d 440, 455, 157 N.W.2d 634 (1968) (cross-appeal on remittitur appropriate when the opposing party appealed a separate issue); *Merlino v. Mut. Serv. Cas. Ins. Co.,* 23 Wis. 2d 571, 585–86, 127 N.W.2d 741 (1964) (plaintiff accepted the option to take judgment for a reduced amount rather than have a new trial on the damage issues; plaintiff has this right where the opposing party, as here, appeals).

tion."[117] When a circuit court fails to analyze the evidence or to set forth the reasons supporting its decision, the reviewing court should give no deference to the circuit court's decision.[118] Conclusory statements regarding the excessiveness of an award are insufficient to establish appropriate exercise of discretion when contemplating a damage award.[119]

¶ 225. The parents contend that the circuit court failed to state the reason for the reduction of damages with the requisite particularity and that therefore no deference is owed to the circuit court's determination that the jury award was excessive. We agree with them.

¶ 226. The circuit court reduced the $550,000 jury verdict to $100,000, concluding a discussion of the difficulty of comparing the pain and suffering of different people, with the following statement:

> [T]here was a limited period of time in which this young child unfortunately had to endure conscious pain and suffering. . . . and I think it's in a case like this, it's not what figure a jury should have come up with, but rather, I think, at what point that point is of being excessive. There is no doubt in my mind that $550,000 for what had been the evidence in this case was excessive. The difficulty is where was the point where it became so. . . . [C]onsidering all of those factors, I believe that the plaintiff ought to be given the option . . . of accepting a sum of $100,000 . . . .

[117] *Fahrenberg v. Tangel,* 96 Wis. 2d 211, 229–230, 291 N.W.2d 516 (1980). *See also Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.,* 190 Wis. 2d 650, 669–70, 529 N.W.2d 905 (1995).

[118] *Carlson & Erickson,* 190 Wis. 2d at 669; *Fahrenberg,* 96 Wis. 2d 211, 229–230, 291 N.W.2d 516, 525 (1980).

[119] *Mgmt. Computer Servs. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 557 N.W.2d 67 (1996).

¶ 227. The circuit court did mention that Shay Maurin was "very sick, very very sick," that she had a "troubled night," and that there was "no question that she had" suffered. The depth and scope of Shay's suffering, however, are absent from the circuit court's discussion.

¶ 228. As the circuit court saw it, the limiting factor was time. The circuit court emphasized that the duration of Shay's pain and suffering was less than two full days. The circuit court did not state what other factors it considered when it reduced the award. The circuit court did not enunciate a rationale for substituting an award of $100,000 in place of the figure reached by the jury.

¶ 229. Under these circumstances a reviewing court must review the entire record and determine whether the jury award is excessive.[120] In conducting its analysis a reviewing court must view the evidence in the light most favorable to the party prevailing with the jury.[121]

¶ 230. The progression of Shay's symptoms in the last two days of her life was horrific. Expert physicians informed the jury about the throes of diabetic ketoacidosis. Treating nurses and doctors described her condition spiraling downward. Shay suffered frequent urination, insatiable thirst, lethargy, nausea, dry heaves, restless nights, vomiting brown and black substances, panting, fatigue, and exhaustion.

¶ 231. Shay Maurin was a sick girl before she saw Dr. Hall. On March 5 she went to the General Clinic of West Bend because she was lethargic, continually drinking fluids, and not eating well. The next day, she

---

[120] *Carlson & Erickson,* 190 Wis. 2d at 669.

[121] *Id.* at 669–70.

had no energy to eat anything. When she did try to eat, she would gag. When her mother tried to put her to bed, she began vomiting. Her mother took her to the bathroom, where Shay urinated and dry heaved simultaneously. Shay's mother took her daughter to Hartford Memorial Hospital just before midnight on March 6, 1996. Dr. Hall attended to her but misdiagnosed her.

¶ 232. The next day Shay was tired and miserable. Shay stayed with her aunt, who called Yvette Maurin to report that Shay was vomiting "brown, tobaccoy-looking stuff." The girl was lying on the floor and could not get up, so Yvette Maurin had to carry her into the clinic. She reported to the doctor that Shay was dry heaving, urinating, and drinking more. Yvette Maurin carried her daughter to the hospital, where Dr. Madenberg diagnosed that Shay was in acute diabetic ketoacidosis. Shay called out to her mother while Yvette conferred with the doctor about what to do. Ms. Maurin decided to send Shay to the Children's Hospital of Wisconsin. Shay fell unconscious on the way to the children's hospital and never woke up; she died the next day.

¶ 233. Reviewing the evidence in the light most favorable to the plaintiff and the jury verdict, we conclude that the circuit court erred and further conclude that the record supports the jury's pain and suffering award to the Estate. We would therefore remand the cause to the circuit court with directions to vacate the circuit court's order of remittitur and cap the damages for pain and suffering pursuant to Wis. Stat. § 893.55(4)(d).

\* \* \* \*

¶ 234. For the reasons set forth, we write separately first to object to the majority's sua sponte inter-

pretation of the statutes and its failure to give the parties an opportunity to brief and argue the issue. We further conclude that the majority has misinterpreted the statutes and invalidated the limits imposed in the medical malpractice statutes.

¶ 235. JON P. WILCOX, J. (*concurring*). I join the majority opinion in all respects but write separately to address the remittitur issue discussed by the concurrence of Chief Justice Abrahamson and Justice Crooks.[1] The concurrence concludes that "the circuit court erroneously exercised its discretion in ordering remittitur of the jury's pre-death pain and suffering award." Concurrence, ¶ 223. However, the record here clearly indicates that the circuit court considered the appropriate evidence and set forth a logical, rational basis for its decision. As such, the concurrence misapplies the "erroneous exercise of discretion" standard of review. Rather than deferring to the circuit court's proper discretionary determination, the concurrence would have this court substitute its own judgment for that of the circuit court. Thus, I write separately to restate the "erroneous exercise of discretion" standard of review and to emphasize the importance or deferring to discretionary determinations of the circuit court when the circuit court has provided a logical, on-the-record, rationale for its decision.

¶ 236. The concurrence concludes that "the circuit court failed to state the reason for the reduction of damages with the requisite particularity and therefore no deference is owed to the circuit court's determination that the jury award was excessive." Concurrence, ¶ 225. After setting forth only a small portion of the

---

[1] We refer to the concurrence of Chief Justice Abrahamson and Justice Crooks simply as "the concurrence."

circuit court's rationale behind its remittitur decision, the concurrence faults the circuit court for supposedly mentioning only one basis for reducing the damage award and failing to consider other appropriate factors. Concurrence, ¶¶ 227–28. The concurrence then undertakes an independent review of the record and determines ab initio that ·the record supports the jury's damage award. Concurrence, ¶¶ 229–33. As will be demonstrated below, the concurrence is both wrong on the law and wrong on the facts.

¶ 237. It is well established that a circuit court may remit the jury's damage award where it determines that the award " 'is too large to be supported by the evidence.' " *Wester v. Bruggink,* 190 Wis. 2d 308, 326, 527 N.W.2d 373 (Ct. App. 1994) (quoting *Makowski v. Ehlenbach,* 11 Wis. 2d 38, 42, 103 N.W.2d 907 (1960)). *See also Jacque v. Steenberg Homes, Inc.,* 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997) ("Notwithstanding the jury's broad discretion, the circuit court has the power to reduce the amount of . . . damages to an amount that it determines is fair and reasonable."). The power of the circuit court to order remittitur was established in *Powers v. Allstate Ins. Co.,* 10 Wis. 2d 78, 91–92, 102 N.W.2d 393 (1960).[2] In *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158,

---

[2] The rule in *Powers v. Allstate Insurance Co.,* 10 Wis. 2d 78, 91–92, 102 N.W.2d 393 (1960), is now codified in Wis. Stat. § 805.15(6) (1995–96), which provides:

If a trial court determines that a verdict is excessive or inadequate, not due to perversity or prejudice or as a result of error during trial (other than an error due to damages), the court shall determine the amount which as a matter of law is reasonable, and shall order a new trial on the issue of damages, unless within 10 days the party to whom the option is offered elects to accept judgment in the charged amount. If the option is not accepted, the time period

190–91, 557 N.W.2d 67 (1996), this court reaffirmed the *Powers* rule and confirmed that the circuit court's decision to order remittitur is a discretionary act and, as such, is reviewed on appeal under the "erroneous exercise of discretion" standard. Under this standard,

> [a] reviewing court will not reverse a circuit court's discretionary determination if the record shows that discretion was in fact exercised and there exists a reasonable basis for the circuit court's determination after resolving any direct conflicts in the testimony in favor of the prevailing party, *even if the reviewing court would have reached a different conclusion than the circuit court.*

*Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.,* 190 Wis. 2d 650, 669, 529 N.W.2d 905 (1995) (emphasis added). As is true when reviewing any discretionary act, "[i]n any instance where the exercise of discretion has been demonstrated, this court follows a consistent and strong policy against interference with the discretion of the trial court . . . ." *McCleary v. State,* 49 Wis. 2d 263, 281, 182 N.W.2d 512 (1971).[3]

¶ 238. Thus, an appellate court's review of a circuit court's decision to order remittitur is limited to two inquiries: 1) determining whether the circuit court

for petitioning the court of appeals for leave to appeal the order for a new trial under ss. 808.03(2) and 809.50 commences on the last day of the option period.

[3] Although *McCleary v. State,* 49 Wis. 2d 263, 182 N.W.2d 512 (1971), was the seminal case regarding a circuit court's sentencing discretion, reliance on this decision in the present context is particularly appropriate in light of the fact that the *McCleary* court explicitly derived the standards for reviewing a sentencing determination from the standards used when reviewing remittitur decisions in civil cases. *Id.* at 277–78. As this court recognized in *McCleary,* "all discretionary acts are to be reviewed" "in the same manner." *Id.* at 277.

considered the appropriate evidence and 2) examining whether the bases that the circuit court identified for its decision are reasonable. *See Mgmt. Computer Servs.,* 206 Wis. 2d at 191. Under this standard, a reviewing court may not review the record ab initio or reverse a circuit court's remittitur order if the circuit court's decision satisfies both of these requirements. *Id.* at 191–92; *Carlson & Erickson Builders,* 190 Wis. 2d at 669. Applying these standards to the case at bar, the record clearly indicates that the circuit court analyzed the relevant evidence on the record and provided a reasonable basis for its decision.

¶ 239. First, we must examine whether the record indicates that the circuit court analyzed the relevant evidence. *See McCleary* 49 Wis. 2d at 277 ("In the first place, there must be evidence that discretion was in fact exercised."). The concurrence concludes that an ab initio standard of review is appropriate because the circuit court failed to state what factors it considered other than the length of time the deceased suffered. Concurrence, ¶¶ 228–29. Particularly, the concurrence faults the circuit court for not considering the "depth and scope" of the deceased's suffering. Concurrence, ¶ 227. However, the record clearly demonstrates that the circuit court considered all aspects of the deceased's pain and suffering, including the scope and depth thereof.

¶ 240. While the concurrence sets forth but a brief excerpt of the circuit court's remittitur decision, concurrence, ¶ 226, in fact, the circuit court's discussion of the relevant facts underlying its decision was quite extensive:

> In this case, *we had a young child that became ill and progressively so.* The Court's consideration of ques-

tion eight and that of the jury must be as to conscious pain and suffering. We have a young child, we do not have an adult. We did not have somebody that was able, as an adult might, to express what they were going through in those moments, in those last days of her life.

*All we can do is perceive what she was by either the physical indicators, whether it was the vomiting, whether it was apparent worry.* The last words that were spoken by her were related we can read several meanings into that, an expression of love, perhaps, an expression of contemplated death. We don't know. *We certainly know that the last day or more of her life was one of trauma* until she got down to Children's Hospital. We know at that point she was not conscious.

She was conscious at least to the placement—into the placement of that ambulance, perhaps during that trip, and for hours before. *She got up that morning, or I should say she awoke or was aware in the early hours of that morning that she was very sick, very, very sick. She had a troubled night and that was part of the progression of which was spoken. True, there was not acute distress in the early stages but there certainly was progressive deteriorating distress of which there was conscious pain and suffering.*

It is difficult for both the jury, I believe as well as myself, to sit and put some dollar sign which is the only measure of how much pain and suffering consciously there was. But that is the job that they were given and that I have. A court should not disturb their judgment unless it is clearly apparent that they went beyond some point. What is that point? It is not written in books. It is written nowhere except in discretion and judgment.

. . . .

136

In this case I believe the limitations are not that a young girl had suffered. No, there's no question that she had. And the question is not how much—in this question is not how much her parents had suffered because it was a mess. *It was how much she suffered consciously.* And we can—it's so difficult for human beings to place a number. We cannot wear the shoes of another person, be it a five year-old child or 60 year-old adult. It is so difficult to compare pain and suffering, whether somebody is suffering from third-degree burns on 43 percent of their body, and I've seen those cases, how tragic they are. *I can't compare that to a five year-old girl who may very well know that she is not ever going to see her parents again and never going to live her life expectancy, or just the worry and concern of will she get through this day, does she know that, or why does it hurt so bad.* Those are the very, very difficult things that went through the minds of a jury and go through mine.

The limiting factor here is time. And there is no number, nor is it right and proper as our Appellate Courts have reiterated to put—it would be reversible error, as we know, to have—if Mr. End had argued minutes of pain and suffering. We are prohibited from doing so. But the reality is that there was a limited period of time in which this young child unfortunately had to endure conscious pain and suffering. And I believe that—and I think it's in a case like this, its not what figure a jury should have come up with but rather, I think, at what point that point is of being excessive. There is no doubt in my mind that $550,000 for what had been the evidence in this case was excessive. The difficulty is where was the point where it became so.

I do not believe that this jury verdict in it's [sic] entirety was perverse, nor necessarily that their answer to question eight was perverse, or solely the result of passion, emotion that one cannot erase in a case like this.

> Considering all the factors, I believe that the plaintiff ought be given an option under the *Powers* rule of accepting a sum of $100,000 for conscious pain and suffering and answer question eight or be given the option under that rule of having a new trial on damages.

(Emphasis added.)

¶ 241. Thus, while the circuit court did not discuss the gruesome particulars of the deceased's journey towards death, the circuit court indicated that it was well aware that the deceased experienced a great deal of conscious pain and suffering that continued to progress before she passed away. The court specifically mentioned that it considered the deceased's progressive trauma, vomiting, and other "physical indicators" of pain and suffering during the last hours of her life. The court demonstrated it considered the nature and scope of the deceased's suffering by noting that although "there was not acute distress in the early stages[,] . . . there certainly was progressive deteriorating distress of which there was conscious pain and suffering." In addition, the court indicated that it was aware of the fear and anxiety the deceased must have experienced in not knowing what was wrong with her and not knowing whether she would be with her parents or die.

¶ 242. The record plainly indicates that the circuit court considered the scope and depth of the deceased's conscious suffering in light of her physical symptoms, anxiety, and the actual amount of time she consciously suffered. As such, the first prong of the discretionary standard is satisfied. Therefore, this is not a case where the "circuit court fail[ed] to analyze the evidence or set forth the reasons supporting its decision, [such that] the reviewing court should give no

deference to the circuit court's decision." *Mgmt. Computer Servs.,* 206 Wis. 2d at 191.

¶ 243. Next, we must determine whether the circuit court provided a reasonable explanation for its remittitur decision. *McCleary,* 49 Wis. 2d at 277 (discretion "contemplates a process of reasoning"). As the passage above indicates, the circuit court reasoned that despite the serious nature of the progressive suffering the deceased experienced, the main limiting factor was the amount of time the deceased *consciously* suffered. The court noted that the deceased lost consciousness sometime after she entered the ambulance as she was being transported to Children's Hospital. This was roughly two days after she first began feeling ill. However, contrary to the assertion of the concurrence, this was not the only factor the court relied upon in ordering remittitur. Concurrence, ¶ 228. The court also explained that because the deceased was a child, it was difficult to determine the full extent of what she consciously experienced, as the record did not contain any verbalizations of her suffering.

¶ 244. Under the erroneous exercise of discretion standard, even if this court does not agree with the factors or bases identified by the circuit court as supporting its decision, we must nevertheless defer to the circuit court's judgment and uphold its determination if the bases for its decision are reasonable. *Wester,* 190 Wis. 2d at 327. While the concurrence faults the circuit court for unduly emphasizing the time factor, "[g]iving consideration to various relevant factors . . . involve[s] a weighing and balancing operation, but the weight to be given to a particular factor in a particular case is for the trial court, not this court, to determine." *Cunningham v. State,* 76 Wis. 2d 277, 282, 251 N.W.2d 65 (1977). As has been stated in the context of reviewing a circuit

court's discretionary sentencing determination, "[t]he weight given to each . . . factor, however, is left to the trial court's broad discretion." *State v. Thompson,* 172 Wis. 2d 257, 264, 493 N.W.2d 729 (Ct. App. 1992).

¶ 245. Under this deferential standard of review, the circuit court's explanation for its decision is not unreasonable. *See Wester,* 190 Wis. 2d at 327. The lack of testimonial evidence from the victim as to her pain and suffering and the limited amount of time the evidence indicated she consciously suffered are certainly logical, relevant factors that legitimately bear upon the amount of damages the estate should reasonably recover. As such, the second requirement for a proper discretionary act is satisfied because the circuit court's conclusion is "based on a logical rationale." *McCleary,* 49 Wis. 2d at 281.

¶ 246. Thus, the record clearly demonstrates that the circuit court 1) considered the relevant evidence and 2) provided a logical, rational basis for its decision. Therefore, the concurrence errs in asserting that it would be appropriate in this case to review the record de novo, and substitute our own judgment for that of the circuit court. *See McCleary,* 49 Wis. 2d at 281 ("An appellate court should not supplant the predilections of a trial judge with its own."). As we have previously stated, if the record demonstrates that the circuit court considered the evidence and articulated a reasonable basis for its decision, this court "must not find an erroneous exercise of discretion." *Mgmt. Computer Servs.,* 206 Wis. 2d at 191.

¶ 247. Finally, this court has recognized that "[i]n applying the *Powers* rule, the [circuit] court must set the amount of damages at a figure which it considers to be the most reasonable in view of the evidence, and since reasonable men may differ, the trial court's deter-

mination will be upheld if it falls within a range of reasonableness." *Lewandowski v. Preferred Risk Mut. Ins. Co.*, 33 Wis. 2d 69, 78, 146 N.W.2d 505 (1966). Thus, even if this court is of the opinion that the jury's award of damages was not excessive, we must nonetheless defer to the circuit court's determination, so long as it properly exercised its discretion in rendering its decision. *See Matosian v. Milwaukee Auto. Ins. Co.*, 257 Wis. 599, 603, 44 N.W.2d 555 (1950). Even viewing the evidence in the light most favorable to the plaintiff, the circuit court's decision to order remittitur of the estate's damages for pre-death pain and suffering from $550,000 to $100,000 is not unreasonable, given the record in this case and the circuit court's reasonable explanation.

¶ 248. In sum, the record here clearly indicates that the circuit court considered the appropriate evidence and articulated a logical, rational basis for its decision. As such, the concurrence misapplies the "erroneous exercise of discretion" standard of review. Rather than following this court's strong policy of deferring to the circuit court's proper discretionary determination, the concurrence would have this court substitute its own predilections for the judgment of the circuit court.

¶ 249. I am authorized to state that Justices DAVID T. PROSSER and DIANE S. SYKES join in this concurrence.

¶ 250. ANN WALSH BRADLEY, J. (*concurring*). The constitutionality of Wis. Stat. § 895.04(4) is jeopardized by the extreme interpretation advanced by the majority. It is with good cause that no party or amici argued such an interpretation. No one argued it be-

cause it is clearly wrong. Moreover, the defense bar does not want to jeopardize the constitutionality of the caps.

¶ 251. Although I join the concurrence of Chief Justice Abrahamson and Justice Crooks as to the issues of statutory interpretation and remittitur, I write separately because I am not prepared to join its constitutional discussion. The concurrence correctly notes the impediment it faces in addressing the constitutional implications of the majority's position: the briefs and arguments in this case were framed to address a less radical approach. The concurrence offers a discussion of the constitutional implications of the majority's decisions and reviews authority from other jurisdictions. It recognizes that the discussion of constitutionality is being offered without the benefit of briefs. I prefer to wait until the arguments are fully developed and briefed before I address the constitutional questions. Accordingly, I respectfully concur.